2 A.3d 412 (2010)
415 N.J. Super. 417
S.D., Plaintiff-Appellant,
v.
M.J.R., Defendant-Respondent.
No. A-6107-08T2.
Superior Court of New Jersey, Appellate Division.
Argued March 24, 2010.
Decided July 23, 2010.
*413 Jennifer J. Donnelly argued the cause for appellant (Northeast New Jersey Legal Services, Inc., attorneys; Ms. Donnelly, of counsel; Ms. Donnelly and Michelle J. McBrian, on the brief).
M.J.R., respondent pro se, waived appearance.
Before Judges CUFF, PAYNE and MINIMAN.
The opinion of the court was delivered by
PAYNE, J.A.D.
Plaintiff, S.D., appeals from the denial of a final restraining order following a finding of domestic violence. On appeal, she raises the following issues:
POINT ONE
THE TRIAL COURT ABUSED ITS DISCRETION BY FINDING THAT DOMESTIC VIOLENCE HAD BEEN COMMITTED BUT FAILING TO ISSUE A FINAL RESTRAINING ORDER.
A. Defendant's conduct constituted an egregious act of domestic violence.
B. The pendency of simultaneous court proceedings, does not negate the importance of affording domestic violence protections when justified by the record.
C. Given that the parties were about to have a child in common, the trial court erred in determining that the parties would have no further need for communication.
POINT TWO
THE TRIAL COURT ABUSED ITS DISCRETION BY FINDING THAT DEFENDANT LACKED THE REQUISITE INTENT TO COMMIT SEXUAL ASSAULT AND CRIMINAL SEXUAL CONTACT BASED UPON HIS RELIGION.
We reverse and remand for entry of a final restraining order.

I.
The record reflects that plaintiff, S.D., and defendant, M.J.R., are citizens of Morocco and adherents to the Muslim faith. They were wed in Morocco in an arranged marriage on July 31, 2008, when plaintiff was seventeen years old.[1] The parties did not know each other prior to the marriage. On August 29, 2008, they came to New Jersey as the result of defendant's employment in this country as an accountant. They settled in Bayonne, where they were joined one month later by defendant's mother.
*414 As plaintiff described it at trial, the acts of domestic abuse that underlie this action commenced on November 1, 2008, after three months of marriage. On that day, defendant requested that plaintiff, who did not know how to cook, prepare three Moroccan dishes for six guests to eat on the following morning. Plaintiff testified that she got up at 5:00 a.m. on the day of the visit and attempted to make two of the dishes, but neither was successful. She did not attempt the third. At 8:00 a.m., defendant arrived at the couple's apartment with his guests. He went into the kitchen, but nothing had been prepared. Defendant, angry, said to plaintiff, "I'm going to show you later on, not now, I'm not going to talk to you right now until the visitors leave." Approximately two hours later, the visitors departed. According to plaintiff:
At that time I was sitting in my room. I was afraid. I was afraid, what is he going to do to me? So I started to read some of our holy book the Koran and the visitors left around 10 o'clock a.m. and he said to me, now I'm going to start punishing you. So he started to pinch me all over my body. He would go  the pinching he would do it like a sensation with his fingers over circulation in my flesh, then he'd pull his fingers out.
I felt he was enjoying hurting me.
When asked to describe specifically where defendant was pinching, plaintiff responded that the pinching took place on her breasts, under her arms, and around her thighs; that the pinches left bruises; and that some of the bruises remained at the time that a detective from the Hudson County Prosecutor's office took pictures of her body on November 22, 2008. The punishment continued for approximately one hour, during which time plaintiff was crying. Plaintiff testified that, while administering the punishment, defendant said "I am doing all that to correct you. You have to learn to do something." Nonetheless, plaintiff stated that she "kept all this inside of [her] and we started to live again together, normal life."
An additional incident took place on November 16, 2008. At approximately 3:00 p.m., defendant announced that he planned to have guests who were to arrive at approximately 9:00 or 10:00 that night, and he asked plaintiff to prepare a supper for them. Plaintiff responded that she did not know how to cook. Defendant then left the apartment, returning at 6:00 with his mother and stating that she would do everything. The mother-in-law refused plaintiff's offers of help, so plaintiff went to her room. At some time thereafter, plaintiff, in anger and frustration, pushed papers that defendant had placed on a desk in the bedroom to the floor.
Plaintiff stated that the guests left at approximately midnight, and that defendant came into the bedroom between twelve and one.
When he came in and he saw everything on the floor  so he entered and he came toward me and he took all my clothes off me. It was very cold day. I had two pants on. He said, what, you think you're going to escape my punishment to you? Let's see what we're going to do now.
After that he took off all my clothes and he said the first  before we start punishing you, now you're nude. You have no clothes on. Even my underwear wasn't on. So I felt I was an animal, like an animal. So he said first of all, you better go and pick [up] everything from the floor. Then he said, now we're going to start punishing you. Then he started to pinch my private area. And he was pinching my tits or my chest area. I was crying.
*415 Additionally, plaintiff testified that defendant pulled her pubic hair.
Plaintiff stated that her vaginal area was very, very red and that it was hurting. Although she attempted to leave, defendant had locked the door. As a consequence, she attempted to lie on the other side of the bed. Plaintiff testified:
He said to me, no, you can not go and sleep on the side of the bed. You're still my wife and you must do whatever I tell you to do. I want to hurt your flesh, I want to feel and know that you're still my wife. After that  he had sex with me and my vagina was very, very swollen and I was hurting so bad.
The judge then asked: "You told him that you did not wish to have ... intercourse, is that correct?" Plaintiff responded: "Of course because I was  I had so much pain down there." According to plaintiff, the entire episode took approximately two to three hours.
On the following morning, plaintiff asked defendant why he had done what he did. As she reported it, defendant responded
[by] mak[ing] like a list and he would read the list and he started to say, okay, now you don't know how to cook, but there's other stuff you're going to do in the house, around the house. And when I come back from work, I will see  look at the list and see what you did and what you didn't do. Whatever you didn't do, I'm going to punish you the same way I punished you for the stuff that you didn't do before.
An additional incident occurred on November 22, 2008. That morning, following an argument with her mother-in-law, plaintiff locked herself in her bedroom. Defendant, having been refused entry, removed the latch from the door, entered the bedroom, and engaged in nonconsensual sex with plaintiff. Although plaintiff's mother-in-law and sister-in-law were in the apartment, and although plaintiff was crying throughout the episode, neither came to her assistance.
Defendant and his relatives then left the apartment, and plaintiff started to break everything in the bedroom, including one of its two windows. After defendant returned with his mother at approximately 4:00 p.m., plaintiff attempted to leave the apartment. However, defendant pulled her back into the bedroom and assaulted her by repeatedly slapping her face, causing her lip to swell and bleeding to occur. He then left the room, and plaintiff escaped without shoes or proper clothing through the unbroken window.
Once outside, plaintiff encountered a Pakistani woman from whom she requested shoes. Seeing plaintiff's condition, the woman called the police, who arrived shortly thereafter, along with an ambulance. Plaintiff was taken to Christ Hospital in Jersey City, where her injuries were treated, photographs were taken, and an attempt was made by detectives from the Hudson County Prosecutor's Office to interview her. However, she was too distraught to speak with them at length. Four of the photographs of plaintiff's body, introduced as exhibits at trial, appear in the appendix to defendant's brief. They depict bruising to both of plaintiff's breasts and to both of her thighs, as well as her swollen, bruised and abraded lips. Testimony of Detective Johanna Rak, the person who took the photographs, established that the remaining photographs disclosed injuries to plaintiff's left eye and right cheek. She testified that bruising appeared on plaintiff's breasts, thighs, and forearm. Additional police testimony established that there were stains on the pillow and sheets of plaintiff's and defendant's bed that appeared to be blood.
*416 On the day of this episode, a domestic violence complaint was filed, and a temporary restraining order was issued. However, the action was later dismissed for lack of prosecution.
Following the November 22 incident, plaintiff took up residence with a Moroccan nurse from Christ Hospital, and she remained with her until January 15, 2009. On December 22, she was determined to be pregnant. Following a meeting between plaintiff, defendant, the nurse, and the Imam of the mosque at which plaintiff and defendant worshiped, the couple was persuaded to reconcile on the condition that defendant stop mistreating and cursing at plaintiff, that they move back to Morocco at the conclusion of defendant's employment, and that defendant obtain an apartment where the couple could live away from his mother. Plaintiff and defendant moved together into an apartment in Jersey City on January 15, 2009. Defendant's mother lived elsewhere.
However, on the night of the reconciliation, defendant again engaged in nonconsensual sex three times, and on succeeding days plaintiff stated that he engaged in further repeated instances of nonconsensual sex. According to plaintiff, during this period, she was deprived of food, she lacked a refrigerator and a phone, and she was left by her husband for many hours, alone. She responded to her plight by breaking dishes, and on January 18, defendant called plaintiff's parents in Morocco, informed them that plaintiff was "in very bad condition," and asked them to send $600 for a ticket back to Morocco. On January 22, 2009, defendant took plaintiff to a restaurant for breakfast. Upon their return to the apartment, defendant forced plaintiff to have sex with him while she cried. Plaintiff testified that defendant always told her
this is according to our religion. You are my wife, I c[an] do anything to you. The woman, she should submit and do anything I ask her to do.
After having sex, defendant took plaintiff to a travel agency to buy a ticket for her return to Morocco. However the ticket was not purchased, and the couple returned to the apartment. Once there, defendant threatened divorce, but nonetheless again engaged in nonconsensual sex while plaintiff cried. Later that day, defendant and his mother took plaintiff to the home of the Imam and, in the presence of the Imam, his wife, and defendant's mother, defendant verbally divorced plaintiff.[2]
Plaintiff remained at the Imam's house until January 25, 2009, at which time she filed a complaint in municipal court against defendant and obtained a temporary restraining order. A complaint was also filed in Superior Court on January 29, 2009, and an additional temporary restraining order was issued. The two actions were merged for trial in the Superior Court.
Plaintiff testified at the trial that she wanted a final restraining order because "I don't want anybody to interfere or push me back to him. So if I have the restraining order, that will protect me from him." Plaintiff testified additionally that she remained in fear of defendant. At the time of the domestic violence trial, a parallel criminal action was also pending.
*417 Defendant did not testify at the domestic violence trial. However, his mother did so, stating in connection with the November 16 incident that defendant did not complain about plaintiff's lack of cooking skills, and she did not hear evidence of discord between the two. With respect to the November 22 incident, the mother testified that after defendant opened the door with a screwdriver, plaintiff hit him and pulled his beard. Plaintiff also allegedly stated that she was going to destroy the family. The mother stated that the reason defendant wished to go into the room was to get his jacket and health insurance information, needed in order to take the mother to the doctor. Upon their return, they found plaintiff asleep, and she refused to leave her room when guests came over. Neither she nor defendant knew that plaintiff had left the house through the bedroom window.
The mother testified additionally regarding the events of January 22, 2009. She stated that, on that day, she pulled up in front of the couple's apartment and opened the car door to permit defendant to sit in the front and plaintiff to sit in the back seat. When defendant announced that he was going to the Imam to procure a divorce, plaintiff commenced to grab defendant's hair and beard and to "beat" him. According to the mother, defendant then took the car, while she and plaintiff walked to the Imam's house. During their walk, plaintiff allegedly stated that she was going to "destroy" defendant for divorcing her, and that she did not care if she were destroyed in the process, as well. When they arrived at the Imam's house, the mother heard plaintiff say that she loved defendant, that she did not wish a divorce, and that she would do anything for him. She did not hear plaintiff complain about nonconsensual sex. The mother stated that, after the divorce, on January 24, she received a phone call from plaintiff, during which plaintiff accused the family of having no decency and stated that the mother was an old, ugly woman.
The nurse who sheltered plaintiff also testified for the defense. She stated that plaintiff's statement that she wanted her baby to be with his father prompted the nurse's attempt to arrange a reconciliation between plaintiff and defendant. However, she admitted that plaintiff had complained of domestic abuse during the course of the reconciliation meeting, and that defendant had been instructed to cease abusing her. The nurse testified further that, during plaintiff's three-day stay with the Imam, plaintiff called her in seeming distress. When the nurse visited plaintiff the next day, plaintiff complained about the divorce but not any mistreatment. Although plaintiff was supposed to make arrangements to go to Morocco, she determined to stay in the United States, saying "after what [defendant] did, I cannot leave his life like that."
Testimony was additionally offered for the defense by the Imam regarding matters in issue. The Imam testified that defendant sought to divorce plaintiff because she threatened to go to the police, but that she never mentioned to him being forced to engage in nonconsensual sex. According to the Imam, although defendant sought a divorce, plaintiff opposed it. The Imam testified additionally that arrangements were made for plaintiff's return to Morocco, but when he and his wife sought to take her to the airport, she refused.
At the conclusion of this testimony, in response to the judge's questions, the Imam testified regarding Islamic law as it relates to sexual behavior. The Imam confirmed that a wife must comply with her husband's sexual demands, because the husband is prohibited from obtaining sexual *418 satisfaction elsewhere. However, a husband was forbidden to approach his wife "like any animal." The Imam did not definitively answer whether, under Islamic law, a husband must stop his advances if his wife said "no." However, he acknowledged that New Jersey law considered coerced sex between married people to be rape.
On June 30, 2009, the judge rendered an oral opinion in the matter. He commenced his opinion by stating that plaintiff alleged that defendant engaged in conduct that constituted assault, criminal restraint, sexual assault, criminal sexual contact, and harassment under the Prevention of Domestic Violence Act. The judge found from his review of the evidence that plaintiff had proven by a preponderance of the evidence that defendant had engaged in harassment, pursuant to N.J.S.A. 2C:33-4b and c,[3] and assault. He found that plaintiff had not proven criminal restraint, sexual assault or criminal sexual contact. In finding assault to have occurred, the judge credited, as essentially uncontradicted, plaintiff's testimony regarding the events of November 1, 16 and 22, 2008. The judge based his findings of harassment on plaintiff's "clear proof" of the nonconsensual sex occurring during the three days in November and on the events of the night of January 15 to 16. He did not credit plaintiff's testimony of sexual assaults thereafter, since there was no corroboration in plaintiff's complaints to the police.[4] The judge also found no criminal restraint to have occurred.
While recognizing that defendant had engaged in sexual relations with plaintiff against her expressed wishes in November 2008 and on the night of January 15 to 16, 2009, the judge did not find sexual assault or criminal sexual conduct to have been proven. He stated:
This court does not feel that, under the circumstances, that this defendant had a criminal desire to or intent to sexually assault or to sexually contact the plaintiff when he did. The court believes that he was operating under his belief that it is, as the husband, his desire to have sex when and whether he wanted to, was something that was consistent with his practices and it was something that was not prohibited.
After acknowledging that this was a case in which religious custom clashed with the law, and that under the law, plaintiff had a right to refuse defendant's advances, the judge found that defendant did not act with a criminal intent when he repeatedly insisted upon intercourse, despite plaintiff's contrary wishes.
Having found acts of domestic violence consisting of assault and harassment to have occurred, the judge turned to the issue of whether a final restraining order should be entered. He found such an order unnecessary, vacated the temporary restraints previously entered in the matter and dismissed plaintiff's domestic violence action. In doing so, the judge characterized *419 November as a "bad patch" in the parties' marriage and plaintiff's injuries as "not severe." The judge then stated:
[T]his is a case where there is no history of domestic violence. In fact, they have been  they were together for only three months. Then the bad patch was three weeks, and then another week.
And then  and then, the record indicates that this defendant has filed for a divorce, he got divorced in  with the Imam, but the record indicates that he has filed for divorce in Morocco. This plaintiff has answered that complaint in Morocco. Divorce proceedings will occur in Morocco.
The defendant has indicated that he is finished with the marriage. The parties are living separate and apart now. This defendant's visa expires in July, I believe.[5]
The judge therefore found that the parties had no reason to be together again, but immediately thereafter, he noted that their baby was expected in August and "[t]hat will require that the parties be in contact presumably." The judge then concluded:
In this particular case, this court does not believe that a final restraining order is necessary under the circumstances. There's no need for the parties to be associated with one another. They are divorced now. They don't live together. They don't have to be together. ...
[T]his was a situation of a short-term marriage, a very brief period of physical assault by the defendant against the plaintiff and it's now a situation where the parties don't live together, won't be living together and won't have a need to be in contact with one another.
Under those circumstances, the court finds that a final restraining order is not necessary to prevent another act of domestic violence. The Court will not enter a final restraining order.
Nonetheless, the judge cautioned defendant not to have any contact with plaintiff and to instruct his family members and friends to have no further contact with plaintiff's family. Additionally, the judge acknowledged that the two would have to be involved in litigation over the baby and child support.
As a final matter, the judge recognized the pendency of a criminal action against defendant, and indicated its existence constituted an additional basis for the judge's ruling denying a final restraining order, since he assumed that a no-contact order had been entered as a condition of bail.
Plaintiff has appealed.

II.
The Supreme Court enunciated the standard of review for an appeal from a trial court's decision in a domestic violence case in Cesare v. Cesare, 154 N.J. 394, 713 A.2d 390 (1998). It stated:
The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence. Deference is especially appropriate "when the evidence is largely testimonial and involves questions of credibility." Because a trial court "`hears the case, sees and observes the witnesses, [and] hears them testify,' it has a better perspective than a reviewing court in evaluating the veracity of witnesses." Therefore an appellate court should not disturb the "factual findings and legal conclusions of the trial judge unless [it is] convinced that *420 they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." ...
Furthermore, matrimonial courts possess special expertise in the field of domestic relations. ... Moreover, the [Prevention of Domestic Violence Act] specifically directs plaintiffs to file their domestic violence complaints with the Family Part of the Superior Court. ...
Because of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to family court factfinding.
[Id. at 411-13, 713 A.2d 390 (citations omitted).]
We, of course, review the judge's legal conclusions de novo. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995).

III.
We first address the judge's dismissal of plaintiff's claims of domestic violence premised on sexual assault and criminal sexual contact. The New Jersey Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35, was enacted in its present form in 1991. In N.J.S.A. 2C:25-18, the Legislature set forth its findings and declaration, stating in relevant part:
The Legislature finds and declares that domestic violence is a serious crime against society; that there are thousands of persons in this State who are regularly beaten, tortured and in some cases even killed by their spouses or cohabitants; that a significant number of women who are assaulted are pregnant; that victims of domestic violence come from all social and economic backgrounds and ethnic groups; that there is a positive correlation between spousal abuse and child abuse; and that children, even when they are not themselves physically assaulted, suffer deep and lasting emotional effects from exposure to domestic violence. It is therefore, the intent of the Legislature to assure the victims of domestic violence the maximum protection from abuse the law can provide.
. . . .
The Legislature further finds and declares that even though many of the existing criminal statutes are applicable to acts of domestic violence, previous societal attitudes concerning domestic violence have affected the response of our law enforcement and judicial systems, resulting in these acts receiving different treatment from similar crimes when they occur in a domestic context.
. . . .
[I]t is the responsibility of the courts to protect victims of violence that occurs in a family or family-like setting by providing access to both emergent and long-term civil and criminal remedies and sanctions, and by ordering those remedies and sanctions that are available to assure the safety of the victims and the public. To that end, the Legislature encourages ... the broad application of the remedies available under this act in the civil and criminal courts of this State. It is further intended that the official response to domestic violence shall communicate the attitude that violent behavior will not be excused or tolerated, and shall make clear the fact that the existing criminal laws and civil remedies created under this act will be enforced without regard to the fact that the violence grows out of a domestic situation.
The PDVA defines "domestic violence" in N.J.S.A. 2C:25-19 to mean the infliction of one or more of an enumerated list of crimes upon a protected person. Among *421 the crimes listed are assault, N.J.S.A. 2C:12-1; sexual assault, N.J.S.A. 2C:14-2; criminal sexual contact, N.J.S.A. 2C:14-3; and harassment, N.J.S.A. 2C:18-3. N.J.S.A. 2C:25-28a authorizes a victim to file a complaint alleging an act of domestic violence in the Family Part of the Chancery Division and to seek temporary restraints. N.J.S.A. 2C:25-28f-j. N.J.S.A. 2C:25-29 then requires that a hearing be conducted within ten days, at which time the judge shall consider, among other things, in making his dual decisions whether to find the occurrence of domestic violence and whether to issue a final restraining order, "(1) [t]he previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse; (2) [t]he existence of immediate danger to person or property;" and other factors that are not relevant to the present proceeding. N.J.S.A. 2C:25-29a. The plaintiff must prove an act of domestic violence by a preponderance of the evidence. Ibid. Following the hearing, the judge may, among other relief, issue a final order "restraining the defendant from subjecting the victim to domestic violence, as defined in this act" or from making contact with the plaintiff. N.J.S.A. 2C:25-29b.
In the present matter, the judge found harassment and assault to have occurred, but declined to find sexual assault or criminal sexual contact, determining that the complained-of conduct occurred, but that defendant lacked the requisite criminal intent.
N.J.S.A. 2C:14-2c provides that "[a]n actor is guilty of sexual assault if he commits an act of sexual penetration with another person" under several circumstances, including when "[t]he actor uses physical force or coercion, but the victim does not sustain severe personal injury." N.J.S.A. 2C:14-2c(1). To establish physical force for the purposes of N.J.S.A. 2C:14-2, the plaintiff does not have to prove force in addition to "that necessary for penetration so long as the penetration was accomplished `in the absence of what a reasonable person would believe to be affirmative and freely-given permission.'" State v. Velasquez, 391 N.J.Super. 291, 319, 918 A.2d 45 (App.Div.2007) (quoting State in the Interest of M.T.S., 129 N.J. 422, 444, 609 A.2d 1266 (1992)). Testimony by plaintiff at trial adequately established the absence of freely given permission.
N.J.S.A. 2C:14-3b provides that "[a]n actor is guilty of criminal sexual contact if he commits an act of sexual contact with the victim under any of the circumstances set forth in section 2C:14-2c." "Sexual contact" is defined as "an intentional touching by the ... actor, either directly or through clothing, of the victim's ... intimate parts for the purpose of degrading or humiliating the victim or sexually arousing or sexually gratifying the actor." N.J.S.A. 2C:14-1. Neither the sexual assault statute nor the criminal sexual contact statute specifies the mental state that must be demonstrated in order to establish the defendant's criminal intent.
The trial judge found as a fact that defendant committed conduct that constituted a sexual assault and criminal sexual contact, but that defendant did not have the requisite criminal intent in doing so. His conclusion in this respect cannot be sustained. N.J.S.A. 2C:2-2c(3) establishes the principle that criminal statutes that do not designate a specific culpability requirement should be construed as requiring knowing conduct.
A person acts knowingly with respect to the nature of his conduct or the attendant circumstances if he is aware that his conduct is of that nature, or that such circumstances exist. ...

*422 [N.J.S.A. 2C:2-2b(2).]
Defendant's conduct in engaging in nonconsensual sexual intercourse was unquestionably knowing, regardless of his view that his religion permitted him to act as he did.
As the judge recognized, the case thus presents a conflict between the criminal law and religious precepts. In resolving this conflict, the judge determined to except defendant from the operation of the State's statutes as the result of his religious beliefs. In doing so, the judge was mistaken.
Early law in this area arose out of prosecutions of Mormons who practiced polygamy. In Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1878), the Supreme Court considered an appeal from a Mormon's conviction under a Congressionally passed bigamy statute applicable to the Utah territory. At trial, the defendant proved that, at the time of his second marriage, it was an accepted doctrine of the Church "that it was the duty of male members of said Church, circumstances permitting, to practice polygamy" and "[t]hat he had received permission from the recognized authorities in said Church to enter into polygamous marriage." Id. at 161, 25 L.Ed. at 248. As a consequence, defendant sought a charge to the jury that "if he was married ... in pursuance of and in conformity with what he believed at the time to be a religious duty, that the verdict must be `not guilty.'" Id. at 162, 25 L.Ed. at 249. The judge refused to give the charge, ibid., and defendant was convicted of the crime.
In affirming the conviction, the Court framed the issue in the following fashion: "Upon this charge and refusal to charge the question is raised, whether religious belief can be accepted as a justification of an overt act made criminal by the law of the land." Ibid. In resolving the issue, the Court noted that "Congress cannot pass a law for the government of the Territories which shall prohibit the free exercise of religion. The first amendment to the Constitution expressly forbids such legislation." Ibid. Nonetheless, the Court found that the First Amendment's guaranty of religious freedom was not intended to preclude the prohibition of polygamy and, therefore, enactment of the statute was within the legislative power of Congress "as prescribing a rule of action for all those residing in the Territories, and in places over which the United States have exclusive control." Id. at 166, 25 L.Ed. at 250. The Court further determined that those who made polygamy a part of their religion were not excepted from the statute's operation. Ibid.
If they are, then those who do not make polygamy a part of their religious belief may be found guilty and punished, while those who do, must be acquitted and go free. This would be introducing a new element into criminal law. Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices. Suppose one believed that human sacrifices were a necessary part of religious worship, would it be seriously contended that the civil government under which he lived could not interfere to prevent a sacrifice? Or if a wife religiously believed it was her duty to burn herself upon the funeral pile of her dead husband, would it be beyond the power of the civil government to prevent her carrying her belief into practice?
So here, as a law of the organization of society under the exclusive dominion of the United States, it is provided that plural marriages shall not be allowed. Can a man excuse his practices to the contrary because of his religious belief? *423 To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself. Government could exist only in name under such circumstances.
[Id. at 166-67, 25 L.Ed. at 250.]
The Court then observed that "criminal intent is generally an element of crime, but every man is presumed to intend the necessary and legitimate consequences of what he knowingly does." Id. at 167, 25 L.Ed. at 250. Because the defendant knew he had been married once and that his first wife was living, and he also knew that his second marriage was legally forbidden, when he married a second time he is presumed to have intended to break the law, thereby committing a crime. Ibid.
Every act necessary to constitute the crime was knowingly done, and the crime was therefore knowingly committed. Ignorance of a fact may sometimes be taken as evidence of a want of criminal intent, but not ignorance of the law. The only defen[s]e of the accused in this case is his belief that the law ought not to have been enacted. It matters not that his belief was a part of his professed religion; it was still belief, and belief only.
[W]hen the offense consists of a positive act which is knowingly done, it would be dangerous to hold that the offender might escape punishment because he religiously believed the law which he had broken ought never to have been made. No case, we believe, can be found that has gone so far.
[Ibid., 98 U.S. at 167, 25 L.Ed. at 250-51.]
See also Cleveland v. United States, 329 U.S. 14, 67 S.Ct. 13, 91 L.Ed. 12 (1946) (affirming the conviction of defendant practitioners of polygamy under the Mann Act upon a determination that they transported their wives across state lines for immoral purposes and a rejection of defendants' claim that, because of their religious beliefs, they lacked the necessary criminal intent).
Similarly, in Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), the Court, relying on Reynolds, held in an often-quoted statement:
The constitutional inhibition of legislation on the subject of religion has a double aspect. On the one hand, it forestalls compulsion by law of the acceptance of any creed or the practice of any form of worship. Freedom of conscience and freedom to adhere to such religious organization or form of worship as the individual may choose cannot be restricted by law. On the other hand, it safeguards the free exercise of the chosen form of religion. Thus the Amendment embraces two concepts,  freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society.
[Id. at 303-04, 60 S.Ct. at 903, 84 L.Ed. at 1218.][6]
*424 Reynolds and the language of Cantwell were utilized by the New Jersey Supreme Court in State v. Perricone, 37 N.J. 463, 472-74, 181 A.2d 751 (1962), an action affirming the appointment of a special guardian for the child of Jehovah's Witnesses in order to permit him to obtain a potentially lifesaving blood transfusion.
Over the years, the United State Supreme Court's treatment of Free Exercise Clause cases has changed. In brief, in Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), the Court reversed a denial of unemployment benefits to the plaintiff, a Seventh Day Adventist, because of her unwillingness to accept Saturday employment. In reversing, the court held that the government's action substantially burdened plaintiff's free exercise of religion, Id. at 403-04, 83 S.Ct. at 1793-94, 10 L.Ed.2d at 970-71, and that its action was not justified by a compelling government interest in the regulation of a subject within the State's constitutional power to regulate. Id. at 406-09, 83 S.Ct. at 1795-96, 10 L.Ed.2d at 972-73.[7]See also, Thomas v. Review Bd. of Ind. Employment Sec. Div., 450 U.S. 707, 717-19, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624, 634 (1981) (applying Sherbert and holding that the denial of unemployment benefits to plaintiff who lost his job when he refused on religious grounds to manufacture armaments substantially burdened his exercise of religion and was not justified by a compelling governmental interest); Hobbie v. Unemployment Appeals Comm'n of Florida, 480 U.S. 136, 141-42, 107 S.Ct. 1046, 1049, 94 L.Ed.2d 190, 197-98 (1987) (holding that the State could not condition the availability of unemployment insurance benefits on a person's willingness to forego conduct required by his religion).
However, in Employment Div., Dep't of Human Res. of Oregon v. Smith, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), the Supreme Court held that the Free Exercise Clause did not require Oregon to exempt the sacramental ingestion of peyote by members of the Native American Church from Oregon's criminal drug laws. Id. at 876-82, 110 S.Ct. at 1599-1602, 108 L.Ed.2d at 884-88. The Court determined that such valid, generally applicable, and neutral laws may be applied to religious exercise even in the absence of a compelling governmental interest. Id. at 882-89, 110 S.Ct. at 1602-06, 108 L.Ed.2d at 888-92. In doing so, the Court held that "[t]he only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections." Id. at 881, 110 S.Ct. at 1601, 108 L.Ed.2d *425 at 887.[8] Further, the Court confined the balancing test of Sherbert v. Verner to cases invalidating denials of unemployment compensation, and it concluded that where a Sherbert analysis was applied in another context, it never resulted in an invalidation of the statute at issue. 494 U.S. at 883-84, 110 S.Ct. at 1602-03, 108 L.Ed.2d at 888-89. The Court stated:
Even if we were inclined to breathe into Sherbert some life beyond the unemployment compensation field, we would not apply it to require exemptions from a generally applicable criminal law. The Sherbert test, it must be recalled, was developed in a context that lent itself to individualized governmental assessment of the reasons for the relevant conduct.
[Id. at 884, 110 S.Ct. at 1603, 108 L.Ed.2d at 889.]
The Court concluded:
The government's ability to enforce generally applicable prohibitions of socially harmful conduct, like its ability to carry out other aspects of public policy, "cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development." To make an individual's obligation to obey such a law contingent upon the law's coincidence with his religious beliefs, except where the State's interest is "compelling"  permitting him, by virtue of his beliefs, "to become a law unto himself,"  contradicts both constitutional tradition and common sense.
[Id. at 885, 110 S.Ct. at 1603, 108 L.Ed.2d at 889-90 (citations and footnote omitted).]
Congress responded to Smith by passing the Religious Freedom Restoration Act (RFRA), 42 U.S.C.A. § 2000bb to 2000bb-4, which resurrected the substantial burden test, providing that "[g]overnment shall not substantially burden a person's exercise of religion[,] even if the burden results from a rule of general applicability... [unless] it demonstrates that application of the burden ... is in furtherance of a compelling governmental interest[] and is the least restrictive means of furthering that interest." 42 U.S.C.A. § 2000bb-1(a) and (b).
However, in City of Boerne v. Flores, 521 U.S. 507, 536, 117 S.Ct. 2157, 2172, 138 L.Ed.2d 624, 649 (1997), the Supreme Court held that in enacting the RFRA, Congress had exceeded its enforcement power under § 5 of the Fourteenth Amendment, and thus the statute was unconstitutional as applied to the states. In response to Boerne, Congress enacted the Religious Land Use and Institutionalized Persons Act (the RLUIPA), 42 U.S.C.A. § 2000cc to 2000cc-5, which has the same substantive standard as the RFRA but a considerably narrowed applicability. The RLUIPA applies when a substantial burden to the exercise of religion is imposed as the result of the government's regulation of land use by religious assemblies or institutions or by regulations affecting persons residing in an institution such as a prison. See 42 U.S.C.A. § 2000cc and § 2000cc-1. In either case, the receipt of federal financial assistance by the program or institution is required. Ibid.
*426 No statute has been enacted that affects legislation of general application of the sort that is at issue here. It consequently appears that Smith continues to control our decision in this case. Because it is doubtlessly true that the laws defining the crimes of sexual assault and criminal sexual contact are neutral laws of general application, and because defendant knowingly engaged in conduct that violated those laws, the judge erred when he refused to recognize those violations as a basis for a determination that defendant had committed acts of domestic violence.
In this context, we note, as well, the Legislature's recognition of the serious nature of domestic violence, the responsibility of the courts to protect victims of such violence and its directive that the remedies of the PDVA be broadly applied. See N.J.S.A. 2C:25-18, quoted at length earlier in this opinion. The Legislature's findings and declaration provide an additional basis for the rejection of the judge's view of defendant's acts as excused by his religious beliefs, and for a recognition of those acts as violative of New Jersey's laws.

IV.
Following a finding that a defendant has committed a predicate act of domestic violence, the judge is required to consider whether a restraining order should be entered that provides protection to the victim.
Although this second determination  whether a domestic violence restraining order should be issued  is most often perfunctory and self-evident, the guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29a(1) to -29a(6), to protect the victim from an immediate danger or to prevent further abuse. See N.J.S.A. 2C:25-29b (stating that "[i]n proceedings in which complaints for restraining orders have been filed, the court shall grant any relief necessary to prevent further abuse"). ...

Silver v. Silver, 387 N.J.Super. 112, 127, 903 A.2d 446 (App.Div.2006).
In the present matter, the judge properly found that defendant had assaulted and harassed plaintiff in violation of the PDVA. However he declined to enter a final restraining order, determining that the domestic violence constituted merely a bad patch in a short-term marriage and did not result in serious injury to plaintiff, and that plaintiff and defendant had separated, a divorce proceeding was pending in Morocco, and the parties had no reason for further contact. Nonetheless, the judge recognized that contact between the parties would necessarily occur upon the birth of their child. The judge additionally appeared to be sufficiently concerned about the likelihood of renewed domestic violence to instruct defendant to have no contact with plaintiff. In this regard, he also relied upon the likelihood that a no contact order had been put in place as a condition of defendant's bail in the pending criminal proceedings against him arising from the acts of domestic violence that formed the basis for the civil action.
The judge's ruling raises several areas of concern that we regard as warranting reversal and a remand to permit the entry of a final restraining order. We construe the judge's characterization of the violence that took place as a bad patch in the parties' marriage and plaintiff's injuries as not severe as manifesting an unnecessarily dismissive view of defendant's acts of domestic violence. Although it is true that the November episodes spanned only three weeks, that period constituted approximately one-fourth of the parties' marriage. Moreover, we find it significant to the issue of whether a final restraining order *427 should have been granted that the violence resumed on the very first night of the parties' reconciliation, and after defendant had assured the Imam that he would not engage in further such acts. We additionally note plaintiff's testimony that the significant bruising to her body shown on the photographs taken on November 22 merely represented the remnants of the bruising inflicted on November 1 and 16. In our view, the abuse that took place in this case was far removed from the domestic contretemps found not to constitute abuse in cases such as Kamen v. Egan, 322 N.J.Super. 222, 227-28, 730 A.2d 873 (App. Div.1999); Corrente v. Corrente, 281 N.J.Super. 243, 248-50, 657 A.2d 440 (App. Div.1995); and Peranio v. Peranio, 280 N.J.Super. 47, 54-56, 654 A.2d 495 (App. Div.1995). We are also concerned that the judge's view of the facts of the matter may have been colored by his perception that, although defendant's sexual acts violated applicable criminal statutes, they were culturally acceptable and thus not actionable  a view that we have soundly rejected.
Additionally, we are troubled by the judge's seeming acknowledgement, at one point in the course of his decision, that restraints might be appropriate and his reliance on a no contact order that he presumed had been put in place in the pending criminal proceeding as affording adequate protection to plaintiff in the civil domestic violence matter. As a preliminary matter, we note that the judge did not verify the existence, terms or duration of the presumed order. Further, we have previously recognized that a complaint brought under the PDVA and a criminal proceeding brought for the same conduct "are separate and distinct matters." State v. Brown, 394 N.J.Super. 492, 504, 927 A.2d 569 (App.Div.2007). There, we observed that "[t]he legislative history demonstrates that the Act `anticipates and provides for simultaneous or subsequent criminal proceedings' unimpacted by the other, except for a contempt proceeding." Id. at 505, 927 A.2d 569 (quoting Cannel, New Jersey Criminal Code Annotated (Gann 2007), comment on N.J.S.A. 2C:25-29 (2007); N.J.S.A. 2C:25-29). We stated in Brown:
As the Prevention of Domestic Violence Act demonstrates, the purpose of an action in the Family Part, designed to protect an individual victim, is quite different than a criminal case in which the State prosecutes a defendant on behalf of the public interest. The Act was enacted "to assure the victims of domestic violence the maximum protection from abuse the law can provide." N.J.S.A. 2C:25-18. The Legislature found that "it is the responsibility of the courts to protect victims of violence that occurs in a family or family-like setting by providing access to both emergent and long-term civil and criminal remedies and sanctions[.]" Ibid. The Act further states that "[a] victim shall not be prohibited from applying for, and a court shall not be prohibited from issuing, temporary restraints pursuant to this act because the victim has charged any person with commission of a criminal act." N.J.S.A. 2C:25-26(f).
[Brown, supra, 394 N.J.Super. at 504, 927 A.2d 569.]
We find it inappropriate, when restraints are civilly required, for a Family Part judge to rely on restraints issued in a parallel criminal proceeding. This is particularly the case because the need to protect the victim-spouse may outlive the termination of the criminal action.
As a final matter, we find that the judge failed to give sufficient measured consideration to the imminence of the birth of the couple's child  an event that the judge *428 acknowledged would bring the two into contact and almost inevitably be a source of conflict. In this regard, we note that defendant's previous misconduct consisted not only of sexual acts that were unlikely to be repeated given the couple's estrangement, but also acts of assault and harassment that were more likely to be repeated in the future.
Viewing the evidence as a whole, we are satisfied that the judge was mistaken in determining not to issue a final restraining order in this matter in order to protect plaintiff from future abuse and in dismissing plaintiff's domestic violence complaint. We therefore reverse and remand the case for entry of such an order.
Reversed and remanded.
NOTES
[1] Plaintiff was born on October 10, 1990.
[2] The Imam testified that defendant divorced plaintiff on January 24, 2009, and called him to announce the fact shortly thereafter. Because plaintiff was pregnant, the divorce would not become effective until the child was delivered. If she had not been pregnant, the divorce would have become effective after three months if plaintiff's husband did not reconcile with her.
[3] The statute provides in relevant part that

a person commits a petty disorderly persons offense if, with purpose to harass another, he:
. . . .
b. Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or
c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.
[4] In response to an objection by plaintiff's counsel, the judge later recognized that the police report upon which he relied in finding no corroboration for plaintiff's claims had not been admitted in evidence because of its hearsay nature. However, he declined to modify his ruling.
[5] The judge indicated that plaintiff's visa status was unclear, because she was seeking to stay in the United States as a victim of domestic violence.
[6] In Cantwell, however, the Court reversed convictions of Jehovah's Witnesses charged with violating a state statute prohibiting solicitation for an alleged religious, charitable or philanthropic cause unless the cause was approved by the secretary of the public welfare council, who was directed to approve the same if he regarded the cause as a religious or bona fide charitable one. The Court held that conditioning the issuance of a permit on the secretary's view of what constituted a religious cause constituted censorship of religion, prohibited by the First Amendment. Id. at 305, 60 S.Ct. at 904, 84 L.Ed. at 1219. But see Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944), construing a state child labor law as validly prohibiting a Jehovah's Witness adherent from permitting a child to sell religious pamphlets on the street, even if accompanied by an adult guardian, and stating: "The right to practice religion freely does not include liberty to expose ... the child ... to ill health or death." Id. at 166-67, 64 S.Ct. at 442, 88 L.Ed. at 653.
[7] We note, however, that the Sherbert Court observed:

The door of the Free Exercise Clause stands tightly closed against any governmental regulation of religious beliefs as such. ... On the other hand, the Court has rejected challenges under the Free Exercise Clause to governmental regulation of certain overt acts prompted by religious beliefs or principles for "even when the action is in accord with one's religious convictions, [it] is not totally free from legislative restrictions." The conduct or actions so regulated have invariably posed some substantial threat to public safety, peace or order.
[Id. at 402-03, 83 S.Ct. at 1792, 10 L.Ed.2d at 969-70.]
[8] The Court cited to Cantwell, supra, 310 U.S. at 304-07, 60 S.Ct. at 903-05, 84 L.Ed. at 1218-19; Murdock v. Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943) (invalidating a flat tax on solicitation as applied to the dissemination of religious ideas); Follett v. McCormick, 321 U.S. 573, 64 S.Ct. 717, 88 L.Ed. 938 (1944) (same); and Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (finding Wisconsin's interest in compulsory education to be insufficient to overcome Amish parents' objection to such education as contrary to their religious beliefs).