# RECORD IMPOUNDED

### NOT FOR PUBLICATION WITHOUT THE
### APPROVAL OF THE APPELLATE DIVISION

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2988-22

B.A., JR.,[1]

    Plaintiff-Respondent,

v.

B.G.,

    Defendant-Appellant.

Submitted January 22, 2024 – Decided February 1, 2024

Before Judges Sabatino and Chase.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FV-12-2308-23.

Gomperts McDermott & Von Ellen, LLC, attorneys for appellant (Marisa Lepore Hovanec, of counsel and on the brief).

Respondent has not filed a brief.

PER CURIAM

---

[1] We use initials in this domestic violence case to protect the identities of the parties. R. 1:38-3(b)(12).

Defendant B.G. ("appellant") seeks reversal of the Family Part's April 21, 2022 decision granting a Final Restraining Order ("FRO") against her in favor of plaintiff B.A., Jr. ("respondent")[2] pursuant to the Prevention of Domestic Violence Act of 1991, N.J.S.A. 2C:25-17 to -35 (the "PDVA").

For the reasons that follow, we affirm the trial court's finding that appellant committed a predicate act of domestic violence under the PDVA, "prong one" as required by the two-prong construct set forth in Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006). However, we remand this matter to the trial court to reconsider whether restraints are necessary under "prong two" of Silver, after a fuller evaluation of the factors listed within the statute.

The following abbreviated background will suffice for purposes of this opinion. Appellant and respondent were formerly in a relationship and lived together for three years. The parties have three children together.

Appellant asserted that she had previously obtained an FRO against respondent in 2018 that lasted until she voluntarily dismissed it during the COVID-19 pandemic.

In April 2023, appellant filed a complaint against respondent alleging his

---

[2] Because the parties litigated multiple cases against one another, in which they were sometimes the plaintiff and sometimes the defendant, we shall refer to them as "appellant" and "respondent" to minimize confusion.

commission of domestic violence against her in violation of the PDVA. At the time, the parties were living together. Appellant first obtained a temporary restraining order ("TRO") against respondent, and then obtained an FRO after a hearing on April 11, 2023.

Appellant contends the April 11 FRO was granted to her as a result of respondent assaulting her "with such force that he chipped her tooth, ripped her clothing, and left bruises all over her body." Appellant further asserts that respondent was charged and arrested for simple assault because of that physical altercation.

The April 11 FRO barred respondent from appellant's residence and place of employment, prohibited future acts of domestic violence, prohibited any communication with appellant, prohibited his possession of firearms or weapons, required him to "undergo domestic violence counseling, substance abuse evaluation and any treatment," provided for supervised parenting time through respondent's sister, and required a calculation of child support.

At 11:25 a.m., minutes after the April 11 hearing concluded, respondent allegedly received a text message from appellant. The text message stated as follows:

I hope you and [name omitted][3] live a very happy life together. We hope it was worth losing your family and seeing your child daily. I guess beating your baby mother up who did everything for you for a fat, ugly 47-year-old was worth it. You literally ruined your life for another old white trash bag. Your poor daughters.

Upon receiving that text message, respondent immediately filed a domestic violence complaint against appellant and obtained an TRO against her that same day. Respondent's complaint variously alleged that appellant: had contacted his family members in an attempt to misinform him of the Family Part court date, repeatedly reached out to family members to "speak ill" of him, reached out to coworkers and their spouses asking about him, and put a tracking device on his phone and vehicle.

The Family Part conducted a hearing on respondent's application on April 21, 2023. Both parties, who were self-represented, testified. No other witnesses were presented.

The focus of the trial was the text message respondent received immediately after the previous April 11 FRO hearing. The trial court asked respondent how he knew the text came from appellant. In reply, respondent testified he knew she was the sender "[b]ecause [he] ha[d] her blocked on . . .

---

[3] From the parties' testimony, the name appears to be that of respondent's new partner.

A-2988-22

over forty-five different fake phone numbers."

Resuming his testimony, respondent testified the text made him feel "[s]ad. I mean, I felt like [appellant] was kicking me when I was down. She knew she won the case so for to say that to me is like what more—like I'm not bothering her . . . . I'll walk away gladly, but to kick me while I'm down."

When the trial court asked respondent if he was "afraid of [appellant][,]" he testified, "Yes, for the simple fact that she always gets one over on me." Respondent continued, "I mean, I just got a job, and now I can't even take it because I'm here in court. And like she's complaining about support, but I can't work because I'm in jail.[4] So, when is it going to stop?" Pressed for more information, respondent testified, "It's like she comes in and . . . she doesn't care."

Respondent then attempted to elaborate on his narrative of appellant allegedly having access to his passwords and taking over his email and social media accounts, speaking to coworkers and tracking his car. However, he was unable to provide any corroborating evidence of such conduct to the trial court.

---

[4] This reference appears to relate to the assault charge that appellant previously filed against respondent.

A-2988-22

Consequently, the trial court dismissed those allegations and focused solely on the April 11 text message.

The trial court confirmed with respondent that the parties "had a significant history of domestic violence" and "there's been complaints filed by you, filed by [appellant]," and that the parties "were [in court] on April 11th."

When asked by the court at the April 21 hearing why he wanted a restraining order against appellant, respondent testified:

> Just so we can stop—I don't want to bother her, I really don't . . . I don't want her bothering me and my family when I'm trying to get my life together as well. That's all I want. I don't want no—I don't wish her any bad ill will. I just don't want her—I don't want her to keep bothering me the way she's been doing. I don't bother her. I don't call family, friends, nobody. I just want the same respect.

The trial court then addressed respondent's text message allegation with appellant. She testified:

> I didn't send a text message. [Respondent] has a history of retaliating. We had . . . an FRO back in 2018. He tried to also do the same thing when we went for our final restraining order in 2018. I had a FRO for harassment on him. He did the same thing in court, a couple minutes right after our court date went and filed a TRO on me back then. The TRO was thrown out . . . . This is the same.

A-2988-22

The trial court asked appellant "[w]ho would send a message right after you left [the courtroom]." Appellant responded she thought respondent had sent the text himself, noting that he did not "want[] [her] to do well in life." She claimed his allegation against her about the text message was a form of retaliation. She also claimed that respondent had previously impersonated her in an email to her mother. On inquiry by the court, appellant denied ever using a different phone number to contact respondent.

Upon considering the parties' competing narratives, the court concluded that respondent had met his burden of establishing a predicate act of domestic violence. The court also concluded that respondent had shown his need for restraints.

In its oral decision, the court noted that the testimony of appellant at the previous April 11 FRO hearing was consistent with the tenor of the post-hearing text message. The court also noted the "timing of the text message at 11:25 a.m. was literally within minutes" after the end of the prior FRO hearing, which added to respondent's credibility.

Additionally, the trial court found that appellant "lack[ed] credibility" in her denial that she had sent the text message. In this regard, the court noted respondent's testimony that "his [cell phone] number was blocked and the only

way [the text message] could have come through is using some application to provide a random phone number."

After finding plaintiff credible and defendant incredible concerning the relevant events, the court discussed whether the text message comprised harassment. Placing that that question into context, the court observed "these parties have a significant history of harassment and that this case is a continuum of their tumultuous relationship."

The court found that the text message constituted "a communication . . . likely to cause annoyance or alarm" and thereby satisfied the definition of harassment under N.J.S.A. 2C:33-4. The court noted the timing of the text transmission—immediately after the April 11 FRO hearing—was "essentially poking the bear . . . and really taunting [respondent] about what had happened." The court found the message "would be unique" to appellant as the source of the harassing communication.

Turning to the second prong of the analysis, the court observed that "the appropriate thing to do to keep the peace between the parties is to issue restraints on both sides." In that spirit of reciprocity, the court directed that appellant "should be restrained from contacting [respondent] to keep the peace, given the significant history of domestic violence." The trial court therefore granted the

FRO in respondent's favor.

Now represented by counsel, appellant seeks to overturn the FRO. She essentially argues that: (1) the proofs were inadequate to establish she committed a predicate act of harassment by sending the post-hearing text message; and (2) there was insufficient need for restraints shown. Respondent has not filed an opposing brief.

We evaluate these two core contentions under well-established standards of review. The entry of an FRO under the PDVA requires the trial court to make certain findings, pursuant to a two-step analysis. See Silver, 387 N.J. Super. at 125-27. Initially, the court "must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125. The trial court should make this determination "in light of the previous history of violence between the parties." Ibid. (quoting Cesare v. Cesare, 154 N.J. 394, 402 (1998)). Secondly, the court must determine "whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29(a)(1) to -29(a)(6),[5] to protect the victim from an immediate danger or to prevent further

---

[5] As recited in the PDVA, the six factors are:

abuse." Id. at 127 (citing N.J.S.A. 2C:25-29(b)'s provision that "[i]n proceedings in which complaints for restraining orders have been filed, the court shall grant any relief necessary to prevent further abuse"); see also J.D. v. M.D.F., 207 N.J. 458, 476 (2011).

We evaluate a family judge's findings on these two prongs with a considerable degree of deference. The Family Part's findings are binding on appeal, "when supported by adequate, substantial, credible evidence." Cesare, 154 N.J. at 411-12. "[This court] defer[s] to the credibility determinations made by the trial court because the trial judge 'hears the case, sees and observes the witnesses, and hears them testify,' affording it 'a better perspective than a reviewing court in evaluating the veracity of a witness.'" Gnall v. Gnall, 222

---

(1) [t]he previous history of domestic violence between the plaintiff and defendant, including threats, harassment, and physical abuse; (2) [t]he existence of immediate danger to person or property; (3) [t]he financial circumstances of the plaintiff and defendant; (4) [t]he best interests of the victim and any child; (5) [i]n determining custody and parenting time the protection of the victim's safety; and (6) [t]he existence of a verifiable order of protection from another jurisdiction.

[N.J.S.A. 2C:25-29(a)(1)-(a)(6).]

A-2988-22

N.J. 414, 428 (2015) (quoting Cesare, 154 N.J. at 412); see also S.D. v. M.J.R., 415 N.J. Super. 417, 429-30 (App. Div. 2010).

This court also bears in mind the expertise of Family Part judges, who routinely hear many domestic violence cases. Cesare, 154 N.J. at 413. We will not disturb the "factual findings and legal conclusions of the trial judge unless [we are] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." S.D., 415 N.J. Super. at 429 (quoting Cesare, 154 N.J. at 412). However, we review de novo a trial judge's legal conclusions. C.C. v. J.A.H., 463 N.J. Super. 419, 429 (App. Div. 2020).

Applying these principles, we have no hesitation in affirming the trial judge's finding that respondent met the first prong of Silver and proved the predicate act of harassment. We defer to the court's finding that respondent's testimony was more credible than that of appellant with respect to the source of the text message and the surrounding events. As the court reasonably noted, the tenor and timing of the message was consistent with an attempt to alarm or seriously annoy respondent, who had just lost the previous FRO case with

appellant minutes earlier in the courtroom.[6] The conduct suffices to be deemed harassment under N.J.S.A. 2C:33-4. Moreover, the trial judge had a proverbial "feel" for the parties' ongoing disputes.

That said, we part company with the trial court's stated rationale under the second prong concerning the necessity of restraints against appellant. The court did not address the six factors germane to necessity, which are set forth in N.J.S.A. 2C:25-29(a)(1) to (6). The court instead adopted a generic approach of reciprocity, concluding that it would help "keep the peace" if both parties were restrained. We appreciate the court's perception that each of the two parties has been attempting, back and forth, to prevail over the other party—in and out of the courthouse. Nonetheless, the court's existing discussion of the second prong is insufficient, as is, to adjudicate the second prong of Silver.

Consequently, we remand this matter to the trial court[7] to reconsider and amplify its analysis under the second prong of Silver. The court shall have the discretion to reopen the hearing and adduce additional testimony if it finds it

---

[6] We note the dissonance between appellant obtaining restraints against respondent communicating with her and, as the court found, appellant promptly initiating a communication to respondent.

[7] If the FRO judge has since retired, a different Family Part judge shall conduct the remand, and shall be furnished with the transcripts of the previous proceedings.

A-2988-22

beneficial to do so.  In the meantime, the restraints ordered in the FRO remain in place, pending the trial court's remand determination.  Based on the remand proceeding, the court has the prerogative to reaffirm or vacate its ruling.  After that, either aggrieved party may pursue a new appeal.

All other arguments raised on appeal lack sufficient merit to warrant discussion in this opinion.  R. 2:11-3(e)(1)(E).

Remanded.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2988-22