RECORD IMPOUNDED

 NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-0537-15T4

IN THE INTEREST OF L.C.,
A JUVENILE.

___________________________

 Submitted April 26, 2017 – Decided July 31, 2017

 Before Judges Fuentes, Gooden Brown and
 Farrington.

 On appeal from the Superior court of New
 Jersey, Chancery Division, Family Part, Union
 County, Docket Nos. FJ-20-691-15, FJ-20-790-
 15, FJ-20-842-15, FJ-20-855-15 and FJ-20-918-
 15.

 Joseph E. Krakora, Public Defender, attorney
 for appellant (Alison S. Perrone, Designated
 Counsel, of counsel and on the brief).

 Grace H. Park, Acting Union County Prosecutor,
 attorney for respondent (N. Christine Mansour,
 Special Deputy Attorney General/Acting
 Assistant Prosecutor, of counsel and on the
 brief).

PER CURIAM

 The juvenile, L.C., challenges identification evidence

introduced by the State during a bench trial before Judge Robert

A. Kirsch as too suggestive, unreliable and unpersuasive to support

the adjudications of delinquency. L.C. also argues that the
Court's weighing of the dispositional factors does not support the

length of the sentence. For the reasons which follow, we affirm.

 L.C. was adjudicated delinquent for acts which, if committed

by an adult, would constitute four counts of first-degree armed

robbery and related aggravated assault and weapons offenses,

specifically four counts of armed robbery, a first degree offense

in violation of N.J.S.A. 2C:15-1; four counts of possession of a

weapon for an unlawful purpose, a second degree offense in

violation of N.J.S.A. 2C:39-4a; four counts of aggravated assault,

a fourth degree offense in violation of N.J.S.A. 2C:12-1b(4);

three counts of unlawful possession of a weapon, a second degree

offense in violation of N.J.S.A. 2C:39-5b; and one count of

attempted armed robbery, a second degree offense in violation of

N.J.S.A. 2C:15-1 and N.J.S.A. 2C:5-1, for which he received an

aggregate five-year sentence to Jamesburg.

 The charges stemmed from a robbery spree over several days,

during which L.C. robbed owners and employees of small business

establishments at gunpoint using a silver revolver with tape on

the handle. The evidence presented by the State consisted of in-

court and out-of-court eyewitness identifications, video

surveillance footage and still photographs derived therefrom, a

mask found on L.C.'s person, and a loaded silver revolver with

tape on the handle recovered in proximity to L.C.

 2 A-0537-15T4
 On appeal, L.C. argues:

 POINT I

 THE ADJUDICATION OF DELINQUENCY MUST BE
 REVERSED BECAUSE THE STATE'S UNRELIABLE AND
 SUGGESTIVE IDENTIFICATION EVIDENCE DOES NOT
 SUPPORT A FINDING THAT THE JUVENILE WAS A
 PARTICIPANT IN THE ROBBERIES.

 POINT II

 A CORRECT WEIGHING OF ALL FACTORS DOES NOT
 SUPPORT THE IMPOSITION OF A FIVE-YEAR TERM OF
 INCARCERATION.

 We first address L.C.'s arguments that the State's

identification evidence does not support a finding that L.C. was

a participant in the robberies. L.C. was arrested on March 9,

2015, after attempting to commit the last of a series of armed

robberies involving multiple small businesses.

 At trial, testimony was adduced showing that on March 8, 2015,

an African-American youth, later identified as L.C., entered the

Scarlet Grocery store wearing a mask, which covered the lower

portion of his face up to the bridge of his nose. He was dressed

in all black. His appearance caused the store employee, Melvin

Flores, to be suspicious. After standing at the ATM, L.C. walked

toward Flores, pulled out a silver revolver and pointed it at

Flores' head. Thereafter, according to the other employee, Carlos

Abreu, he pointed the gun at Abreu, at which time Abreu threw

himself to the ground and banged on the freezer door, after which

 3 A-0537-15T4
L.C. ran out of the store. The employees did not hand over any

money, nor did they initially report the incident to the police.

 On the following day, a heavyset African-American woman came

in with an African- American juvenile, later identified as L.C.'s

co-juvenile. The woman surveyed the store, bought some candy and

gum and left with the African-American male. According to Flores,

the juvenile was wearing a gray hoodie with white tassels. Flores

followed them out of the store and observed them in front of a

house conversing. Shortly thereafter, another African-American

man entered the store, with his hands in his waistband and wearing

a mask on his face up to the bridge of his nose. Flores told

Abreu to hit the alarm and the man fled. Flores and Abreu observed

the two men, and the woman, running down Fifth Street.

 The police arrived in approximately two to three minutes in

response to the alarm. Officer Rodney Dorilus testified that on

March 9, he was working in the municipal court, and had left for

lunch when he heard the radio broadcast of an armed robbery at 75

Fifth Street. A description was given of two men and a woman and

the direction they were last seen proceeding. He decided to head

toward the location in a marked police vehicle. He saw the three

suspects crossing East Jersey toward Sixth Street. They were

walking rapidly when he first saw them, but when they observed the

marked vehicle they slowed down and were walking casually.

 4 A-0537-15T4
 The officer testified that he called for additional units which

arrived within a minute as the three suspects started to split up.

Officers Leonardo Nunes, Rogerio Alves and several other units

arrived at the scene. Officer Dorilus detained the woman, Alves,

the co-juvenile, and Officers Victor Matos and Nunes detained L.C.

Officer Dorilus identified the co-juvenile in court as the

individual wearing the gray hoodie and L.C. as the other African-

American youth. On cross-examination, the officer testified that

there were no other groups of individuals who matched the

description of the individuals involved in the robbery in the

vicinity of the arrest. The three were patted down and placed in

separate radio cars. Flores and Abreu were taken to the scene of

the arrest approximately ten or fifteen minutes later, where they

individually viewed the three suspects one-by-one. Both Flores

and Abreu identified all three individuals.

 Flores testified that the police told him nothing prior to

conducting the identification procedure. He identified the co-

juvenile first. He further testified that the person who walked

into the store on March 9 with the woman, was not the person who

pointed the gun at him on March 8. Abreu was driven to the

location by the police, about a three-minute drive. During the

drive, he testified the police told him they were going to take

him to the people they "had nabbed" one by one so he could identify

 5 A-0537-15T4
them. Abreu testified the people were handcuffed, behind the

patrol car, while he was sitting in the patrol car about 20-22

feet away. He identified, in court, the co-juvenile as the person

who accompanied the female into the store on March 9, and L.C. as

the person who had pointed the weapon at him on March 8.

 On cross-examination, Abreu testified that the individual who

pointed the gun at him wore all black clothing. He recognized L.C

in part because of the clothes he wore, because L.C. wore the same

clothes on March 8 and 9. Abreu, who testified that he was

previously the owner of the Scarlet Grocery, stated the store had

approximately ten video surveillance cameras. The surveillance

videos introduced into evidence corroborated the identifications.

 After the identification, the suspects were taken to

headquarters for booking. Flores and Abreu were taken to police

headquarters to give statements. Abreu, a native of the Dominican

Republic, understands "a little bit" of English, but cannot read

English. Abreu in his statement said, "Yes. He (the co-juvenile)

was outside today, but he had the gun yesterday." Flores, a native

of El Salvador, was interviewed by Detective Michael Gonzalez.

Detective Gonzalez is fluent in Spanish and testified that Flores

was nervous and said he feared retribution. The questions were

asked in Spanish and both answers and questions were recorded in

English. In court, Detective Gonzalez identified the co-juvenile

 6 A-0537-15T4
and noted he was wearing a gray pullover hoodie with white draw

strings. He also identified L.C. in court as wearing a black

short sleeve shirt. He testified he was familiar with both

juveniles from previous interactions.

 Detective Gonzalez testified on cross-examination that Flores

indicated in his statement that on the day after the robbery, only

L.C. came into the store, and L.C. had been the one with the gun

on March 8. According to Flores, the co-juvenile, dressed in gray

with white draw strings, never came into the store on March 9.

When questioned during cross-examination about his statement,

Flores stated that he did not recall his response to the question:

"When you arrived at the scene where the possible suspects were,

did you identify anyone there?" to which his answer was, "Yes.

There were three shown to me separately. I identified the two

that were in the store -- the girl and black male that came inside

with his hand in his waistband. Then the other guy that was

waiting for them outside." Flores affirmed on cross-examination

that it was L.C. who came in with the gun, that he was nervous the

day he gave the statement, and that he had trouble understanding

the detective's questions. He further testified the co-juvenile

did not have a weapon on either day.

 Abreu testified that on March 9, a woman and a young man

wearing a gray hoodie came into the store and bought candy. The

 7 A-0537-15T4
two left and then a male came into the store who Abreu thought was

the same individual who had just been in with the female. The

alarm was pushed and the police arrived in seconds. He and Flores

told the police the direction in which the people had gone.

 Officer Leonardo Nunes testified he heard the radio broadcast

and responded to the vicinity looking for suspects fitting the

description of the robbers. He heard Officer Dorilus call for

backup and went to the area of Sixth Street and Broadway. He

testified that Officer Dorilus had the female detained, and told

him to get the other suspect who was walking away. This suspect

was an African-American man wearing a black hoodie and had hair

coming out from under the hoodie. He held the suspect by the

front of his pants and patted him down "everywhere except his

privates" and handcuffed him. He stayed with the individual

through the identification process. Officer Nunes identified L.C.

as the suspect he detained.

 After checking Officer Matos' police vehicle and finding it

empty, Officer Nunes placed L.C. in the rear of the car and

followed Matos to police headquarters. Officer Matos observed

L.C. moving about in the back of the car. When Officer Matos took

L.C. out of his vehicle, he found a silver revolver with white

tape on the handle on the floor. Officer Matos alerted Officer

Nunes to the gun, which Officer Nunes removed from the vehicle.

 8 A-0537-15T4
The gun had two bullets in it. No one else had been in the

passenger compartment that day. Officer Nunes spoke to Flores and

Abreu after finding the weapon and asked them in Spanish to

describe the weapon. They described a revolver and specifically

stated it had white tape on the handle. After they described the

weapon, Officer Nunes showed them the gun, which had been found

in Officer Matos' vehicle, and both Flores and Abreu simultaneously

identified the gun. The gun and the bullets were produced in

court and Officer Nunes identified it as the one he recovered from

Officer Matos' vehicle and identified by Flores and Abreu.

 Officer Alves testified that he was at the lineup. He is

fluent in Spanish. He testified that he told Flores and Abreu

that "we have possible suspects obtained here based upon your

descriptions. Tell me yes or no if they were involved." He

testified that the "Two of them were very excited. Not scared,

but excited when they saw . . . the suspects." When asked to

describe how they were excited, he stated, "Describe how they were

excited. Very certain of what they saw. They were trying to get

their message out. Yeah, yeah, yeah. That -- kind of excited."

 Officer Alves testified that he processed both L.C. and the

co-juvenile. He identified a black ski mask and a black cotton

hat as having been taken from L.C., whom he identified in the

court room. He further testified L.C. gave a home address which

 9 A-0537-15T4
is five or six blocks from the Scarlet Grocery. L.C. was wearing

a black hooded sweatshirt, black sweatpants and black boots. He

also testified at the time of the arrest the co-juvenile was

wearing a gray sweatshirt with matching gray pants and black

sneakers.

 As a result of the arrests in connection with the Scarlet

Grocery robbery, an investigation was conducted of similar recent

robberies in the area. The investigation revealed that on March

5, 2015, L.C. robbed the Bienvenido a Elin Deli, also located in

Elizabeth. The store has four surveillance cameras, two of which

were recording on that day. The owners, Rafael Rosario and his

wife Luz Jimenez, were both working at the time of the robbery.

 On the day in question, Rosario testified he had been

assisting a customer when a young African-American man, "tall"

wearing a hoody which he removed, and a "nice haircut" 16 or 17

years old came into the store, and asked if he sold "loosies".

Rosario told him no and he left. While he continued assisting the

customer, a second African-American man came into the store, shook

snow off his feet, said hello to Jimenez and then pointed a gun

at her. Rosario described it "like a .38," "shiny and silver

like", "a revolver". The person holding the gun was a "young guy,

about 14, 15, 17 years old. He was black, wearing a black hooded

sweatshirt and black pants." He was "skinny". Rosario gave him

 10 A-0537-15T4
the money in the register and a laptop. Rosario testified that

he observed the person run straight on Fifth and then turn onto

South Park.

 Rosario called the police and gave the responding officers a

copy of the surveillance video. Approximately one week later, a

police officer arrived at the store and showed Rosario photographs

of potential suspects. However, he was unable to make an

identification. On March 27, 2015, Rosario went to the police

station where he gave a statement. He was unable to identify L.C.

as one of the persons who robbed him. Jimenez identified the co-

juvenile as the one wielding the gun.

 Officer Alexander Blanco testified at the trial. On March

5, he was on duty on Fifth Street when he received a call from

dispatch about a robbery and responded in approximately one minute.

He found the owner outside the store, obtained a description which

matched the one he had received from dispatch and proceeded north

on Fifth toward the area of South Park and Court Street. Officer

Blanco watched the surveillance video with Rosario and his wife,

and realized there were two suspects. He broadcast the information

from the video over the police radio, took cell phone pictures of

the surveillance video images and sent them by text to other police

units.

 11 A-0537-15T4
 When L.C. and the other suspected juvenile were arrested on

 March 9, Blanco requested the arresting officers to send him a

 picture of the juveniles. The picture showed the co-juvenile

 wearing the same gray sweat shirt with white draw strings as he

 did in the Bienvenido a Elin Deli video. Blanco testified he was

 wearing the same sweatshirt in court. Blanco also testified that

 the co-juvenile had a distinctive haircut: "It had a straight line

 across the forehead." He further testified that he saw the co-

 juvenile and L.C. in the holding cell on March 9, and he noticed

 that L.C. had bushy eyebrows, the same as the person in the

 surveillance video.

 On March 7, Nicholas Haddad, son of the owner of the Elizabeth

Truck Stop, was robbed at gun point by an African-American man in

black clothing wearing a ski mask. The truck stop has sixteen

surveillance cameras, fourteen of which were working. Four cameras

recorded the robbery. Haddad testified he was working the seven

a.m. to four p.m. shift. At approximately 2:35 p.m., he was taking

out the trash when an African-American man wearing all black clothes

came in and asked for Newport 100 cigarettes. Haddad left the trash

and walked back to the front of the store. He went around the

counter to retrieve the cigarettes. When he turned around, the man

had a silver gun in his face. The assailant told Haddad to give

him cash from the first register which amounted to approximately

 12 A-0537-15T4
$150.00. He then demanded cash from a second register which was

empty. The assailant then demanded Haddad's license and wallet,

which Haddad did not have on him. Finally, the assailant demanded

the sixteen or seventeen packs of Newport 100 cigarettes that Haddad

had left. The man then put the gun down the front of his pants and

left. Haddad followed the man out the door and watched him go right

toward Sixth Avenue. The incident was captured in the surveillance

video.

 On March 9, the police came to the Truck Stop and Haddad

recounted the facts of the robbery. On March 12, Haddad brought

videos and stills from the cameras at the Truck Stop to his initial

interview with Detective Gonzalez. Haddad returned to police

headquarters on March 18 to view a photo array. The photo array

consisted of six photographs, the target, L.C., and five other

photographs. The array was prepared by Detective Gonzalez, but

conducted by Detective Wlazlowski. Haddad identified the individual

portrayed in picture number 4 as the robber. Picture number four

was a photograph of L.C.

 We are required to accept the findings of a trial judge

following a bench trial unless "they are so manifestly unsupported

or inconsistent with the competent, relevant and reasonably credible

evidence as to offend the interests of justice." S.D. v. M.J.R.,

415 N.J. Super. 417, 429 (App. Div. 2010) (quoting Cesare v. Cesare,

 13 A-0537-15T4
154 N.J. 394, 412 (1998)). In State v. Henderson, 208 N.J. 208

(2011), our Supreme Court set forth a non-exhaustive list of system

variables to be considered and evaluated in determining whether an

out of court identification has been tainted.

 Prior to trial, Judge Kirsch held a Henderson hearing with

regard to the March 8 and 9 incidents and, after evaluating the

system variables set forth in State v. Henderson, supra, declined

to suppress the identification evidence in a decision set forth on

the record on June 5, 2015. Judge Kirsch found the in and out of

court identifications made by Haddad and Flores, in combination

with the videos and still photographs in evidence, and the physical

evidence recovered from L.C.'s person and the police vehicle in

which he was transported, established beyond a reasonable doubt

that L.C. was the individual involved in each of the subject

incidents.

 We find the State met its burden, and the burden thereafter

shifted to the defense to prove a very substantial likelihood of

irreparable misidentification. We find the fact finding and

credibility determinations of the trial court to be amply supported

by the record. For the reasons stated by Judge Kirsch in his

decision, declining to suppress the identification testimony, and

his written decision of June 5, 2015, finding L.C. committed four

 14 A-0537-15T4
counts of armed robbery together with related weapons and assault

charges, the adjudications of delinquency are affirmed.

 We turn to L.C.'s argument that the court did not correctly

assess and weigh mitigating and aggravating factors, thereby

imposing an excessive sentence. Although L.C. had no prior

adjudication, he had previously been in residential treatment on

more than two occasions and failed to complete the programs. The

psychological evaluations in L.C.'s Juvenile Pre-Disposition Report

support the custodial sentence, as do the findings of the trial

judge placed upon the record. Pursuant to N.J.S.A. 2A:4A-43(c)(3):

 The court may fix a term of incarceration
 under this subsection where:

 (a) The act for which the juvenile was
 adjudicated delinquent, if committed by an
 adult, would have constituted a crime or
 repetitive disorderly persons offense;

 (b) Incarceration of the juvenile is
 consistent with the goals of public safety,
 accountability, and rehabilitation and the
 court is clearly convinced that the
 aggravating factors substantially outweigh
 the mitigating factors as set forth in section
 25 of P.L.1982, c.77 (C.2A:4A-44).

For the reasons set forth by the trial judge, we find no abuse of

discretion.

 Affirmed.

 15 A-0537-15T4