# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2795-22

M.B.,

     Plaintiff-Respondent,

v.

T.B.,

     Defendant-Appellant.

_____

Submitted April 24, 2024 – Decided May 16, 2024

Before Judges Currier and Vanek.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Morris County, Docket No. FV-14-0450-23.

The Law Office of John C. Grey Jr. LLC, attorney for appellant (John C. Grey Jr., of counsel and on the brief).

Paul M. Selitto, attorney for respondent.

PER CURIAM

Defendant T.B.[1] appeals from a May 1, 2023 final restraining order (FRO) entered against him in favor of plaintiff M.B., his adult sister, pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35.  The FRO also prevents T.B. from having any contact with his and M.B.'s father, J.B. We affirm the entry of the FRO to protect M.B. and her children.  However, because we conclude there were insufficient factual findings in the record to include J.B. as a protected party, we vacate the portion of the order that prevents T.B. from having any contact with his father.  We remand to the trial court to enter an amended FRO.

I.

We glean the following salient facts from the record of the FRO hearing, at which both parties testified along with one third-party witness.  J.B. did not testify, nor did M.B.'s two children.

T.B. and M.B. are adult siblings—the children of J.B.  At the time of these events J.B. was living with T.B.  M.B. testified that on October 31, 2022, she was  picking up J.B. from a dialysis treatment center.  As she exited her car to speak with a staff member inside the treatment center regarding a "verbal

---

[1]  We use initials to protect the parties' privacy and the confidentiality of these proceedings in accordance with Rule 1:38-3(d)(10).

altercation" between T.B. and an employee the week prior, she saw T.B. approach her with "hostility, aggression and profanity."

M.B. stated T.B. "was wearing a big poop emoji hat" and began yelling "why the f[-]ck are you here." T.B. followed M.B. into the treatment center and continued yelling profanities at her, asking "who are you here to see, who the f[-]ck told you to come here[?]" T.B. "pushed past" her and went into a "restricted area" where patients were receiving treatment. M.B. then left the treatment center.

According to M.B., "about a minute or two later" T.B. left the building and entered the parking lot. M.B. further testified:

> It was like a hornet out of a nest, to be honest. He came right for me and very aggressive and animated, screaming and cursing, you don't f[-]cking work here, why the f[-]ck are you here, if you think you're going to take control, you're mistaken, screaming . . . . And all of a sudden, I just felt force from behind, and I was struck.
>
> . . . .
>
> I was hit from behind . . . [in] my neck and my shoulder area. And I went forward . . . and then I was yanked backwards and went like—like a [ragdoll], just flew, like just forced back, shoved frontwards and yanked backwards.

M.B. screamed for help and ran toward C.N., who had witnessed the incident while he was in the parking lot. M.B. called 9-1-1, and T.B. "got into the car and drove off."

C.N.'s testimony regarding the incident was substantially the same as M.B.'s. He stated after M.B. and T.B. were both outside the treatment facility, T.B. "grabbed [M.B.] from the back and pull[ed] her back and kind of turned her around." He explained the way T.B. grabbed M.B. caused her to go "forward and then back," and could "maybe break her neck."

T.B. acknowledged that he yelled at M.B. because he felt he was not "getting proper information" about his father's care. He testified:

> At that point, I wanted to know what was going on with my father. I was saying talk to me, talk to me, please talk to me. And, at that point, I reached out with one of my hands, I put my hand on her trapezoid, on her shoulder, and I grabbed and I spun her around or attempted to spin her around to talk to me.

Further, T.B. testified he "loves[s his] sister very much" and he "would never want to hurt [his] sister ever."

After law enforcement responded to the scene, M.B. filed a domestic violence civil complaint seeking a temporary restraining order (TRO) based on the predicate offenses of harassment, N.J.S.A. 2C:33-4, and assault, N.J.S.A. 2C:12-1(a). The TRO was entered the same day.

4

M.B. testified she was fearful of T.B., felt harassed, and had to seek medical treatment for the pain she experienced in her neck. After the incident, T.B. was admitted to two hospitals for mental health treatment from November 21, 2022 to January 19, 2023. He was diagnosed with severe depression and bipolar disorder. At the time of the FRO hearing in May 2023, J.B. was living in an assisted care facility.

Three amended TROs were entered at M.B.'s request prior to the FRO hearing. The first prohibited T.B. from improperly using J.B.'s financial resources. The second added M.B.'s two children as protected parties. The third restricted T.B. from returning to the residence of any party.

On February 2, 2023, M.B. was appointed by court order as J.B.'s guardian. After the guardianship order was entered, M.B. went to J.B.'s home, where T.B. had also resided until he was admitted to the hospital for mental health treatment. There, M.B. saw a myriad of weapons in T.B.'s bedroom and in the common areas of the home. M.B. stated:

> I found a long, clublike device with a rounded end and a raised piece on it. I found a long, rifle-shaped plastic like weapon, I guess, with a spear on it in the middle of a stainless[-]steel spear. I found a six-foot whip. I found about [twenty] knives, including little finger grip knives. It was all extremely unsettling, to say the least, as well as like a machete type of knife.

M.B. also testified she found a gas mask in the house and a "tactical" vest, which M.B. likened to a "Rambo" or "police" vest.

It was not the weaponry, however, that M.B. was most concerned about in the home. Rather, M.B. said she was most fearful when she found a brass lock on the door of the home's shared bathroom that was "like an exterior lock." She explained that the lock secured from the hallway, so once a person was in the bathroom, they could be locked in and prevented from exiting. The only key to the lock was on T.B.'s "lanyard with his house key" that M.B. "found in [T.B.'s] bedroom."

M.B. testified she worried T.B. had been locking their father in the bathroom because "[e]very morning when [she] would pick up [J.B.] for dialysis . . . [T.B.] would meet [her] in the driveway and would tell [her] that [J.B. was] in the bathroom, [and that T.B. said he would] let him know that [M.B. was] there." M.B. testified her father had "never told [her] that was happening" and she "put it al[l ]together" when she "gained entry to the house after [being granted] guardianship." M.B. testified she was concerned for her safety, stating: "I felt that [T.B.] had attacked me once and . . . had access to these types of things and could do something with them, to be honest, to me, my dad or my kids."

When M.B. attempted to testify about her father, defense counsel objected on hearsay grounds. The following exchange then took place:

> [M.B.'S COUNSEL]: And what is your concern for your father with regard to your brother?
>
> [M.B.]: My concern is when [J.B.] goes to—when he was going to bed at night expressing to me can [T.B.] get in here, can he get into my room, does he have a key. And I've assured him, no, there's nurses right outside, we have—you have an order of protection.
>
> [T.B.'S COUNSEL]: Judge, again, I'm going to object as to hearsay.
>
> [M.B.'S COUNSEL]: I would suggest a state of mind at this point, Judge.
>
> THE COURT: You know, she's the guardian of her father, so she gets to act kind of in his capacity.
>
> [T.B.'S COUNSEL]: Well, but she's also speaking about things that were said out of court.
>
> THE COURT: Well, here's the only question I need to know the answer to. Two questions. Does your dad know that he would be on this restraining order?
>
> [M.B.]: Yes, he knows.
>
> THE COURT: And did he object to being on the restraining order if a restraining order is entered?
>
> [M.B.]: No, he understands . . . that would mean he probably will never see my brother again, and he's okay.

7

T.B. testified the knives M.B. found were "[c]ollectibles" he had "picked up on Amazon." He also denied modifying the bathroom door to be able to lock his father inside:

> That lock, if that lock was installed there, i[t] would have been installed prior to 2004 when I moved back in with my father. I had no knowledge that—the only time it was ever locked was one time by mistake. . . .
>
> If there was a key on my lanyard, that [supports] the idea that the outdoor locks were changed, not by me, by my mother or father prior to me getting there and we had matched one of those locks. But the idea that I would ever in a million years lock my father in a bathroom is absolutely patently ridiculous. I would never, ever do that to him.

The trial judge found C.N. was an unbiased witness whose testimony was consistent with M.B.'s. C.N.'s testimony contradicted T.B.'s denial that "he punched his sister in the back of the head." The judge accepted C.N.'s testimony that T.B.'s attack on M.B. "was so hard he was worried that . . . [M.B.] could have broke[n] her neck."

As to T.B.'s testimony, the judge found T.B. was credible when he stated he loved his sister. Although the trial judge believed M.B. also loved T.B., she was "afraid of him because of what's been happening here."

The trial judge found the proofs established harassment and assault as the two predicate acts formulating the basis for the FRO. The trial court concluded

A-2795-22

T.B. "committed harassment under [N.J.S.A.] 2C:33-4 because he subjected his sister to striking, shoving and other offensive touching . . . [a]nd he did engage in a course of conduct here that was likely and did, in fact, cause significant emotional upset and emotional harm, harassment."

The trial court concluded that under State v. Hoffman, 149 N.J. 564 (1997), "a single act may be sufficient . . . to constitute alarming conduct" to support a finding of harassment. The judge stated:

> Well, here, certainly the punching in the back of the head and neck area, the pulling her backwards and the swear words all coupled together, you know, is one of those State v. Hoffman situations where that single event, even if there's no prior history of domestic violence between the parties, is enough.

The trial court found pursuant to Cesare v. Cesare, 154 N.J. 394 (1998), that although usually it must consider a history of domestic violence between the parties when deciding the necessity of a FRO, a prior history is not necessary when there is "one sufficiently egregious action."

As to the predicate act of assault, the trial court said:

> [A] preponderance of the evidence standard is not very difficult to prove in a situation like this because you don't have to have significant injury. . . . But under [N.J.S.A.] 2C:12-1, a person does commit assault if they attempt to cause, purposely, knowingly or recklessly, bodily injury to another.

9

So, here, you know, although the bodily injury was not a significant bodily injury, it was bodily injury nonetheless, caused her to have to go to the doctor. The independent witness, he advised he thought it was significant that she would have hurt her neck in the way he jerked her backwards and the way she was hit initially.

After finding predicate acts had been established and concluding that a FRO was necessary to protect M.B. and her children, the trial court then considered M.B.'s request to include J.B. on the FRO as a protected party. The trial court stated:

> As to the various knives and things that were found . . . it doesn't look like any of them are illegal weapons. I am . . . wondering why . . . [T.B.] would need them, but I often say that when I see people have really big gun collections sometimes, like what do you need all those for.
>
> It's that curiosity, you know, collection that sometimes really doesn't have anything to do with the person being of unsound intent, even though, obviously, you have some mental health issues that we're going to talk about in a few moments. . . .
>
> . . . .
>
> And then we have the bathroom door. I will tell you the bathroom door is kind of a mystery. . . . I'm just surprised that any adult, including their father, for any period of time when he was certainly more lucid would allow a lock like that to be on the door.

10

. . . Was [T.B.] locking the father in the bathroom? I don't think there's any evidence that shows that. Did [M.B.] think that might have been happening? I think she might have believed that, but for the incident in the parking lot, I'm not sure if we would be arguing about that today.

The trial court found adding J.B. to the FRO was a much closer call than the decision to include M.B. and her children, saying:

> I am going to put the father on the restraining order for right now, but I really, I'm asking [M.B.] to have a conversation with your dad because with a restraining order perhaps maybe some times can be set so that [T.B.] can't go [visit J.B.] at night, but, you know, maybe once a week or so maybe he can go in and pay your dad a visit, you know, and everybody has a clear head. And if there's a problem, you come in and you shut it off, you know.
>
> But I think you should go home and really talk to [J.B.] about that, think about that because I think that would solve a lot of problems, you know, I do. I think that that would, you know, make this very [livable] for your brother. And, at the same time, you know, everybody has some closure here. And if that's the case, just let [counsel] know and he'll contact the [c]ourt and we could amend that to loosen that up a little bit.

The trial court did not set forth a factual finding that J.B. needed protection from T.B. Nor did the trial court find that including J.B. as a protected party on the FRO was required for M.B.'s safety.

A-2795-22

On appeal, T.B. asserts the trial court's factual findings were against the weight of the evidence, M.B.'s testimony was not credible, and, because there was no history of domestic violence between the parties, it was improper to enter the FRO against him. Additionally, T.B. contends the trial court abused its discretion in adding J.B. as a protected party under the FRO and predicated its decision to do so on inadmissible hearsay proffered by M.B. Therefore, T.B. asks this court to determine the cumulative errors warrant reversal.

Our review of a trial court's decision to enter a FRO in a domestic violence matter is limited. Peterson v. Peterson, 374 N.J. Super. 116, 121 (App. Div. 2005). "A reviewing court is bound by the trial court's findings 'when supported by adequate, substantial, credible evidence.'" Ibid. (quoting Cesare, 154 N.J. at 411-12). "This deferential standard is even more appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" L.M.F. v. J.A.F., Jr., 421 N.J. Super. 523, 533 (App. Div. 2011) (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). When the trial court observes witnesses and listens to their testimony, it is in the best position to "make first-hand credibility judgments about the witnesses who appear on the stand." N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008).

Further, we "accord particular deference to the Family Part because of its 'special jurisdiction and expertise' in family matters." Harte v. Hand, 433 N.J. Super. 457, 461 (App. Div. 2013) (quoting Cesare, 154 N.J. at 413). "Reversal is warranted only when a mistake must have been made because the trial court's factual findings are '"so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice . . ."'" Elrom v. Elrom, 439 N.J. Super. 424, 433 (App. Div. 2015) (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974) (quoting Fagliarone v. N. Bergen, 78 N.J. Super. 154 (App Div. 1963))). However, we review de novo "the trial judge's legal conclusions, and the application of those conclusions to the facts." Ibid. (quoting Reese v. Weis, 430 N.J. Super. 552, 568 (App. Div. 2013)).

The purpose of the PDVA is to ""assure the victims of domestic violence the maximum protection from abuse the law can provide."'" G.M. v. C.V., 453 N.J. Super. 1, 12 (App. Div. 2018) (quoting State v. Brown, 394 N.J. Super. 492, 504 (App. Div. 2007) (quoting N.J.S.A. 2C:25-18)). Consequently, "'[o]ur law is particularly solicitous of victims of domestic violence,'" J.D. v. M.D.F., 207 N.J. 458, 473 (2011) (alteration in original) (quoting Hoffman, 149 N.J. at 584),

and courts will "liberally construe[] [the PVDA] to achieve its salutary purposes." Cesare, 154 N.J. at 400.

In determining whether a FRO was appropriately entered under the PDVA, the trial court must apply the two-prong test established in Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006). First, the court "must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19[(a)] has occurred." Id. at 125.

If a predicate act is established, "the judge must determine whether a restraining order is necessary to protect the plaintiff from future danger or threats of violence." D.M.R. v. M.K.G., 467 N.J. Super. 308, 322 (App. Div. 2021). "Although this second determination— whether a domestic violence restraining order should be issued—is most often perfunctory and self-evident, the guiding standard is whether a restraining order is necessary . . . to protect the victim from an immediate danger or to prevent further abuse." Silver, 387 N.J. Super. at 127.

The trial court is not limited to consideration of only those factors set forth in N.J.S.A. 2C:25-29(a), as it is instructed to weigh:

(1) The previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse;

(2) The existence of immediate danger to person or property;

(3) The financial circumstances of the plaintiff and defendant;

(4) The best interests of the victim and any child;

(5) In determining custody and parenting time the protection of the victim's safety;

(6) The existence of a verifiable order of protection from another jurisdiction; and

(7) Any pattern of coercive control against a person that in purpose or effect unreasonably interferes with, threatens, or exploits a person's liberty, freedom, bodily integrity, or human rights with the court specifically considering evidence of the need for protection from immediate danger or the prevention of further abuse.

"[W]hether the victim fears the defendant" is an additional factor the trial court may consider. G.M., 453 N.J. Super. at 13 (quoting Carfagno v. Carfagno, 288 N.J. Super. 424, 434-35 (Ch. Div. 1995)). Using this analysis, the trial court must determine if under the totality of the circumstances a FRO is necessary "to protect the victim from an immediate danger or to prevent further abuse." Silver, 387 N.J. Super. at 127.

15

III.

We turn first to T.B.'s assertion the trial court erred by failing to make a finding as to a history of domestic violence between the parties. The trial court correctly set forth on the record that, while our decisional law requires courts to consider if there have been prior instances of domestic violence, one sufficiently egregious action negates the need for a prior history to be established. The Court has been clear on this issue:

> Although a court is <u>not obligated to find a past history</u> of abuse before determining that an act of domestic violence has been committed in a particular situation, a court must at least consider that factor in the course of its analysis. Therefore, not only <u>may one sufficiently egregious action constitute domestic violence</u> under the [PVDA], <u>even with no history of abuse between the parties</u>, but a court may also determine that an ambiguous incident qualifies as prohibited conduct, based on a finding of violence in the parties' past.
>
> [Cesare, 154 N.J. at 402 (italicization omitted) (emphases added).]

Thus, based upon <u>Cesare</u>, we are unconvinced that T.B.'s assertions on this issue are meritorious.

IV.

Next, we consider T.B.'s contentions the trial court failed to consider the totality of the relationship between the parties, considered allegations not

16

contained within the TRO, and rendered a decision against the weight of the evidence.

T.B. proffers no specific arguments as to which aspect of the parties' relationship was not considered, and we find no error in the trial court's conclusions based upon its credibility determinations. The trial court recognized the relationship between the parties as siblings and found T.B.'s testimony that he loved his sister believable. However, the judge made findings that other aspects of T.B.'s testimony were not credible, as they contradicted the similar unified testimony of M.B. and C.N., the latter of whom was a disinterested party.

We find no error with the trial court's decision to enter the FRO based on the predicate acts of harassment and assault that occurred on October 31, 2022. Harassment is governed by N.J.S.A. 2C:33-4, which sets forth that a person has committed the predicate act of harassment when he or she:

> a. Makes, or causes to be made, one or more communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
>
> b. Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or

A-2795-22

c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

We affirm the trial court's conclusion that T.B. committed harassment when he subjected M.B. "to striking, shoving and other offensive touching." Additionally, the trial court found T.B. "did engage in a course of conduct . . . that was likely [to] and did, in fact, cause significant emotional upset and emotional harm" to M.B.

The evidence in the record also supports the trial court's finding of the predicate acts of assault. N.J.S.A. 2C:12-1(a), defines assault as follows:

A person is guilty of assault if the person:

(1) Attempts to cause or purposely, knowingly or recklessly causes bodily injury to another; or

(2) Negligently causes bodily injury to another with a deadly weapon; or

(3) Attempts by physical menace to put another in fear of imminent serious bodily injury.

We find no error in the trial court's factual finding that T.B. "attempt[ed] to cause, purposely, knowingly or recklessly, bodily injury to" M.B. Although M.B.'s "injury was not a significant bodily injury, it was bodily injury nonetheless, [that] caused her to have to go to the doctor." Further, C.N.

A-2795-22

"advised he thought . . . that [M.B.] would have hurt her neck in the way [T.B.] jerked her backwards and the way she was hit initially."

Once the first Silver prong was established, the trial court properly moved on to consider if a FRO was needed to protect M.B. "from future danger or threats of violence." D.M.R., 467 N.J. Super. at 322. "[T]he guiding standard is whether a restraining order is necessary . . . to protect the victim from an immediate danger or to prevent further abuse." Silver, 387 N.J. Super. at 127.

The trial court properly weighed all of the N.J.S.A. 2C:25-29(a) factors, as well as M.B.'s fear of T.B. We discern no error in the judge's consideration of T.B.'s weapons or the lock on the bathroom door as part of the overall determination of the need for a FRO to protect M.B. and her children. Nor are we persuaded by T.B.'s argument that the trial court rendered a decision against the weight of the evidence as a whole. See S.D. v. M.J.R., 415 N.J. Super. 417, 429-30 (App. Div. 2010).

## V.

This leaves for our consideration only T.B.'s contention the trial court improperly added J.B. as a protected party based on inadmissible hearsay testimony from M.B. that J.B. was fearful of T.B. N.J.S.A. 2C:25-29(b) sets forth that the Family Part "shall grant any relief necessary to prevent further

19

abuse."  The determination as to the appropriate relief needed in a particular case to accomplish this goal is necessarily fact specific.  Silver, 387 N.J. Super. at 127-28.

T.B. does not dispute that M.B. is now the court-ordered legal guardian of her father – a determination made separate from these events.  The trial court did not have any information regarding the need for the guardianship or the circumstances under which it occurred.  The TRO application did not include J.B. as a plaintiff and M.B. did not allege any acts of domestic violence between T. B. and J.B.  Thus, we review only whether there was sufficient evidence for the trial court to include J.B. as a protected party under the FRO entered in favor of M.B.

Under N.J.S.A. 2C:25-29(b)(7), the trial court may issue a FRO forbidding a defendant from making contact with a plaintiff or "others." "Others" is expressly defined to include those "family members . . . or others with whom communication would be likely to cause annoyance or alarm to the victim."

The trial court is granted broad discretion in crafting the protective provisions of a FRO.  However, the inclusion of a protected party in a FRO must be predicated on a specific factual finding that interaction between the third

party and the defendant is likely to cause a risk of future harm to the victim. See J.D., 207 N.J. at 488 (holding the trial court failed to "sufficiently articulate findings and conclusions consistent with the statutory standards").

Here, the trial court did not make a finding as to the need for J.B. to be included in the FRO as a protected party for M.B.'s safety. A FRO entered under the PDVA already statutorily prohibits contact with the victim through a third-party. N.J.S.A. 2C:25-29(b)(7). Here, there was no evidence presented that any predicate act occurred between T.B. and J.B. or that J. B. needed an FRO for his safety. To the contrary, J.B. was then living in an assisted living facility and the judge suggested M.B. permit her brother to visit him. Accordingly, we vacate the portion of the order including J.B. as a protected party under the FRO.

To the extent we have not considered any of T.B.'s remaining arguments, we are satisfied they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

The FRO is affirmed in part and vacated in part. We remand for the trial court to enter an amended FRO consistent with this opinion.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION