# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0369-24

S.H.H.,

     Plaintiff-Respondent,

v

M.A.D.,[1]

     Defendant-Appellant.

_____

           Submitted January 13, 2026 – Decided January 29, 2026

           Before Judges Perez Friscia and Vinci.

           On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Gloucester County, Docket No. FV-08-1852-23.

           Hoffman DiMuzio, attorneys for appellant (James M. Carter, on the brief).

           Charny, Karpousis, Altieri & Donoian, PA, attorneys for respondent (Melissa R. Knoerzer, on the brief).

---

[1] We use initials to protect victims or alleged victims of domestic violence. R. 1:38-3(d)(10).

PER CURIAM

Defendant M.A.D. appeals from a June 26, 2024 final restraining order (FRO) entered against him in favor of plaintiff S.H.H. pursuant to the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17 to -35 (PDVA), and an August 21, 2024 order awarding plaintiff attorney's fees and expenses.[2] We affirm.

## I.

We summarize the relevant evidence presented at the seven-day trial conducted in connection with plaintiff's application for an FRO. The parties were married for thirty-four years and have two adult children. They resided together in the marital home until June 5, 2022, when plaintiff filed a temporary restraining order (TRO) against defendant arising out of an alleged domestic violence incident that occurred in the home that day and a prior history of alleged incidents of domestic violence and abuse.

On July 7, 2022, plaintiff dismissed the TRO and the parties entered into an order for civil restraints in their pending divorce action, which prohibited

---

[2] Defendant did not brief any arguments relating to the August 21, 2024 order awarding fees and expenses. As a result, those arguments are deemed waived. State v. Huang, 461 N.J. Super. 119, 125 (App. Div. 2018); see also Pressler & Verniero, Current N.J. Court Rules, cmt. 5 on R. 2:6-2 (2026) ("It is, of course, clear that an issue not briefed is deemed waived").

A-0369-24

defendant from having any contact with plaintiff, granted plaintiff exclusive possession of the marital home, and prohibited defendant from entering the home or property. On April 5, 2023, the Family Part judge in the divorce action entered an order requiring the parties "have an I[information] T[echnology] specialist visit the marital home to . . . access the wireless network, servers, etc." Plaintiff retained Peter Certo of Cereus IT pursuant to that order.

At trial, plaintiff testified that the 2022 TRO resulted from an incident on June 5, 2022. Defendant arrived home and began a verbal altercation with her. He "continued to yell" and "threatened to slit [her] throat and kill [her]." "[H]e . . . then tried to break the [garage] door down. [She] repeatedly told him that he was scaring [her] and to stop and to calm down and just go away. He would[ not] and he used an ax sledgehammer to break the door." "The door was destroyed, and [she] was bleeding from trying to protect [herself]. The deadbolt hit [her] in the head and some of the other parts came off. The only way [she] felt safe was to eventually call the police." She had "bruises from head to toe" after the incident.

On May 28, 2023, plaintiff was doing yard work in her backyard when she "heard something that sounded like a swarm of carpenter bees." She "turned and looked up towards the corner of the house, . . . and as [her] eyes came across

3

the sky[,] right there was a drone." She believed defendant was piloting the drone because "there was a search on [their] joint Amazon account the year before in July [for] drones." Plaintiff reported the incident to the local police department.

Plaintiff testified she previously saw a drone on two earlier occasions at the marital home. On one occasion, "near Christmas time" in 2022, she saw red lights reflecting in the family room television, which sat directly across from the windows. She went outside on the deck and "it skipped up over the peak of the house." Plaintiff "saw the tail end of [a drone] jump over" the fireplace. The red lights "in the reflection of the television . . . matched" the red lights she saw on the drone "on May 28[, 2023]."

On a prior occasion, in the fall of 2022, she heard "something hit" the basement sliding door window. She believed it was also a drone because she heard "something that sounded exactly like what [she] had heard [on May 28]." It "sound[ed] like a swarm of bees." She went outside to investigate and discovered a "semicircular scratch" on the door "like something flew up against it." Photographs of the scratch were introduced as evidence at trial.

Plaintiff testified that on June 25, 2023, she was working on a Dell laptop computer that is connected to the network in the marital home and discovered a

 A-0369-24

video file titled "[w]ife in backyard." She "clicked on it, and it was from May 28[]. It was the day [she] had called the police to the house to report seeing the drone. It was . . . [twenty-two] pictures of [her] in [her] backyard and [a] video clip from that day." The photographs and video were introduced as evidence.

When she saw the video and photographs, plaintiff "had [a] mini panic attack" and called her attorney, the police, and Certo. A police officer responded to the house and airdropped the video file to his police issued iPhone. Certo also "logged in remotely to the computer" and "saved the video and the pictures . . . on [an] external [hard] drive."

After discovering the video and photographs on June 25, 2023, plaintiff filed a TRO against defendant. Plaintiff filed an amended TRO on August 2, 2023, alleging the predicate acts of stalking and harassment.

Plaintiff testified she believed defendant had access to the home network after June 5, 2022, until July 14, 2023, when Certo "installed a new router so that [her] Wi[-]Fi would be secured." She testified "there were several instances of things that have happened in the house . . . [and defendant is] a network engineer. [He] designed everything. . . . [Defendant] only had to be within so many feet and his phone, computer would automatically connect to the home Wi[-]Fi."

A-0369-24

She explained "[her] lights would go on and off.  [Her] thermostat would go up and down.  [Her] cameras went off out front.  There w[ere] log[]ins on [her] Facebook.  There was something in Republic Bank, [her] Capital One account, he logged [into] using [her] passwords. . . . There[ was] a lot."  Plaintiff testified that on December 26, 2022, defendant changed her profile name on a streaming service application to "NB," which she interpreted to mean "nobody."  He then changed her profile name again to "chubby-cheeked mouse," which was her nickname "since high school."  She believed defendant "was changing the lights and the temperature . . . . Just to prove to [her] he can get to [her]. . . . [He] can still . . . reach [her]."

Plaintiff testified that "[a]fter . . . [defendant] was served with his TRO paperwork, the laptop [in the marital home] was remotely locked by the administrator."  When she attempted to access the laptop, she saw different messages including that it had been locked by law enforcement "due to unauthorized access" and that it had been locked by an administrator.  She believed defendant remotely locked the laptop because it had been locked by an "administrator" and defendant "was the administrator."  Plaintiff testified defendant previously accessed the network in the fall of 2022 and prevented her from accessing family photographs.  When she attempted to access the

6

photographs she could only view a lock screen that said she did not "have enough privilege."

Plaintiff testified she was seeking an FRO because she "had two TROs. He[] violated both of them. [She] had . . . civil restraint[s]. He[] violated that. He fl[ew] a drone around spying on [her]. He[ was] harassing [her] through electronic means, through financial means. . . . He[ was] abusive mentally and emotionally." As a result of defendant's actions, plaintiff asserted she is "suffering from [post-traumatic stress disorder]. [She] does[ not] want this man in [her] life. . . . He terrifies her."

Plaintiff called Certo as a witness. He testified defendant "had remote access to the home network" because "the home router had a [virtual private network ("VPN")] set up which would allow access from outside the" home. A VPN "establishes a connection from anywhere else on the internet to the home network. . . . [T]he device would act as if it was connected directly to the home network in the same building when it[ is] not." Certo located several devices connected to the network, including "digital light switches," "cameras," "a smart thermostat," and "[s]mart outlets" that could be accessed from outside the home.

Certo testified that the drone video from May 28, 2023, was stored in a file on the Dell laptop "in a folder that was part of the operating system's cloud

7

storage, synchronized cloud shared folder called One Drive." He testified the file originated on another unknown device and synchronized "to the internet . . . [t]he cloud." "And then from there it synchronize[d] down to any machine that has th[e] same [One Drive] account on it, and the [Dell laptop] in [the marital home] did."

Certo also testified that the Dell laptop and another laptop in the marital home "were set up with [remote desktop protocol ("RDP")]." Certo explained RDP allows "[r]emoting into a [device, which] typically lets you control whatever [a user] see[s] on [their] desktop."

Certo concluded defendant "had remotely logged on to the [home] network" by remotely accessing the Dell laptop with a username, "M. D[]." Certo created a "log that showed RDP connections at days and times that did[ not] make sense," including connections "late at night" around "two in the morning." The log "showed that the system was being accessed using the . . . username and password . . . which [he] kn[ew] to be [defendant's] username and password because [defendant]" provided that information to him. Certo did not see evidence of any remote access users other than defendant.

Plaintiff identified a document marked as P-11 during Certo's testimony. Certo testified P-11 standing alone showed only local access, but it contained

A-0369-24

incomplete information. That is, when combined with the remote access log he created, Certo was able to determine someone repeatedly accessed the Dell laptop remotely using defendant's username and password.

Defendant also testified. He denied remotely accessing any devices in the marital home, plaintiff's Facebook account, or her bank accounts. He disputed Certo's contention that he accessed the laptop in the marital home. Specifically, he claimed the document marked as P-11 showed only local access. Defendant claimed the One Drive account where plaintiff found the drone video was his and plaintiff did not have access to it.

Defendant admitted he flew his drone over the marital home on May 28, 2023. He claimed he did so because he had "objections to items for which . . . [plaintiff] was seeking reimbursement, including repair of the fence and grass seed." Defendant was operating the drone from behind a local supermarket "where [he] normally fl[ies his] drone" but he only flew it over the marital home one time on May 28, 2023. He then uploaded the video and photographs from the drone to his Microsoft One Drive account.

On cross-examination, defendant admitted he remotely locked the Dell laptop in the marital home on June 26, 2023. He accessed the laptop through

A-0369-24

his Microsoft One Drive account and "lock[ed] it so no one else could use it." It remained locked at the time of trial.

## II.

On June 26, 2024, the court entered the FRO supported by an oral opinion. The court found plaintiff and Certo were credible witnesses. It found defendant's testimony "to be credible in part and to lack credibility and reasonableness in part." Specifically, the court found "his testimony regarding the functionality of the network system in the marital home to be compromised by his interest in the outcome of the case" and "several areas of his testimony lacked inherent believability."

Applying the two-step analysis set forth in Silver v. Silver, 387 N.J. Super. 112, 125 (App. Div. 2006), the court found defendant committed the predicate acts of stalking, N.J.S.A. 2C:12-10, and harassment, N.J.S.A. 2C:33-4. With respect to stalking, the court found "by his admission . . . [defendant] purpose[fully] and knowingly flew a drone over the marital [home] on May 28, 2023 . . . to maintain a visual proximity to [plaintiff] by observing, monitoring, photographing[,] and videotaping her." The court also determined defendant "created and uploaded to the cloud" a video of plaintiff taken from the drone labeled "[w]ife in backyard."

10

Based on that video file and the nature of the video footage itself, the court found defendant's "testimony that he flew the drone over the marital [home] . . . in order to get a better look at the fence and the lawn [wa]s not reasonable, and that it belie[d] the credible evidence." The court also found, based on plaintiff's testimony that defendant searched for a drone using their joint Amazon account, and she saw a drone "outside her glass door at the back of her house" in December 2022, "that [defendant] flew a drone over the martial [home] in December 2022."

The court found "there was a laptop . . . in the marital home" that "contained files belonging to" both parties and plaintiff "had exclusive possession of the marital" home. The court determined plaintiff "continued to have access to the device . . . until" access to the laptop "was restricted by the administrator" and defendant "was that administrator." The court found "by his own testimony . . . [defendant] knowingly and purpose[fully] logged onto Microsoft and locked the device restricting [plaintiff's] access to the device and the jointly-owned property and information . . . on the device . . . effectively interfering with her property and her ability to access that property." The court also found defendant set up the computer network in the marital home for remote

A-0369-24

access and "was able to and did access the computer network in the . . . marital household repeatedly."

Based on those findings, the court concluded plaintiff proved "the predicate act of stalking by a preponderance of the credible evidence." Specifically, defendant "purposefully and knowingly maintained visual proximity to [plaintiff] on at least two occasions by using a drone to observe her at the marital home, once in December . . . 2022 . . . and again on May 28[,] 2023, where he observed, monitored, surveilled, recorded[,] and photographed her." Defendant "further interfered with her property by locking her out of the shared device that contained files that were the property of both parties." The court found defendant's conduct "would cause fear in a reasonably[]objective person as it did here in [plaintiff]."

The court also concluded plaintiff proved "the predicate act of harassment by a preponderance of the credible evidence." The court found defendant "engage[d] in a course of alarming conduct with the purpose to alarm or seriously annoy" when he

> flew a drone over the marital home in December . . . 2022, observing [plaintiff] from the rear patio door; admittedly used a drone to observe, monitor, surveil, photograph[,] and videotape [plaintiff] while she was in the backyard on May 28, 2023; admittedly locked [plaintiff] out of the shared

12

computer device; admittedly restricted her access to the . . . shared files and information on the . . . device[;] and access[ed] the computer network in the marital home after having been excluded from the home in June . . . 2022.

The court determined defendant "continued to direct this conduct towards [plaintiff] on purpose for no apparent reason" and "there was no reason or credible explanation . . . that is supported by the credible evidence for this course of alarming conduct other than to alarm or seriously annoy [plaintiff]."

Turning to the second prong of Silver, the court detailed the parties' prior history "of violence and verbal altercation[s]," including the June 2022 incident during which defendant "used a sledgehammer ax . . . to hack at the garage door trying to break the door down to regain entry into the home" and "threatened to slit [plaintiff's] throat and kill her." During that incident, plaintiff "sustained injuries to her eye, bleeding lacerations to her hand, [and] bruises to her . . . legs, back[,] and thigh." Based on defendant's prior conduct, the court found plaintiff's "fear for her personal safety" was "reasonable under the circumstances" and plaintiff proved "the need for an [FRO] by a preponderance of the evidence."

On August 21, 2024, the court entered an order awarding plaintiff $51,090 in attorney's fees and costs, and $5,283.80 for Certo's fees and costs. This appeal

13

followed. On January 9, 2025, we entered an order granting plaintiff's motion to settle or supplement the record and ordered the court to "provide an amplification of its decision . . . awarding" attorney's fees and related costs. S.H.H. v. M.A.D., No. A-0369-24 (App. Div. Jan. 9, 2025). On January 15, 2025, the court entered an order amplifying its decision. Defendant did not appeal from that order.

On appeal, defendant argues the court's "findings that [he] committed the predicate acts of stalking and harassment are not supported by substantial, credible evidence." Specifically, defendant contends plaintiff failed to offer credible evidence that he accessed the computer network remotely, attempted to access her Facebook account, adjusted her smart thermostat, or caused her Amazon Echo device to light up. He also denies plaintiff was permitted to access the "One Drive cloud storage account" she accessed to locate the drone video.

He reiterates his claim that he flew the drone over plaintiff's house on May 28, 2023, because he "had objections to items for which . . . plaintiff was seeking reimbursement, including repair of the fence and grass seed." With respect to the December 2022 drone incident, defendant contends plaintiff

"admits to only having seen red lights reflecting in her television before running out to confront it."

Finally, defendant argues "[a]bsent any reasonable or credible explanation, the court found that [his] intent was to harass . . . plaintiff." He contends the court found his conduct was "directed toward . . . plaintiff for 'no apparent reason,'" which "seems to suggest that in the absence of explanation, the court will assume intent to harass."

## III.

Our review of an FRO issued after a bench trial is limited. C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020). In reviewing "a trial court's order entered following trial in a domestic violence matter, we grant substantial deference to the trial court's findings of fact and the legal conclusions based upon those findings." J.D. v. A.M.W., 475 N.J. Super. 306, 312-13 (App. Div. 2023) (quoting N.T.B. v. D.D.B., 442 N.J. Super. 205, 215 (App. Div. 2015)). A trial court's findings are "binding on appeal when supported by adequate, substantial, credible evidence." G.M. v. C.V., 453 N.J. Super. 1, 11 (App. Div. 2018) (quoting Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)). "We defer to the credibility determinations made by the trial court because the trial judge 'hears the case, sees and observes the witnesses, and hears them testify,'

A-0369-24

affording it 'a better perspective than a reviewing court in evaluating the veracity of a witness.'" Gnall v. Gnall, 222 N.J. 414, 428 (2015) (quoting Cesare, 154 N.J. at 412).

We do not disturb a trial court's factual findings unless they are "so manifestly unsupported by or inconsistent with the competent, relevant[,] and reasonably credible evidence as to offend the interests of justice." S.D. v. M.J.R., 415 N.J. Super. 417, 429 (App. Div. 2010) (quoting Cesare, 154 N.J. at 412). "We accord substantial deference to Family Part judges, who routinely hear domestic violence cases and are 'specially trained to detect the difference between domestic violence and more ordinary differences that arise.'" C.C., 463 N.J. Super. at 428 (quoting J.D. v. M.D.F., 207 N.J. 458, 482 (2011)). "[D]eference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" MacKinnon v. MacKinnon, 191 N.J. 240, 254 (2007) (quoting Cesare, 154 N.J. at 412). However, we review de novo a trial judge's legal conclusions. C.C., 463 N.J. Super. at 429.

The entry of an FRO requires the trial court to make certain findings, pursuant to a two-step analysis. See Silver, 387 N.J. Super. at 125-27. "First, the judge must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth

in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125 (citing N.J.S.A. 2C:25-29(a)). The trial court should make this determination "'in light of the previous history of violence between the parties.'" Ibid. (quoting Cesare, 154 N.J. at 402).

Second, the court must determine "whether a restraining order is necessary . . . to protect the victim from an immediate danger or to prevent further abuse." Id. at 127 (citing N.J.S.A. 2C:25-29(b) ("In proceedings in which complaints for restraining orders have been filed, the court shall grant any relief necessary to prevent further abuse.")). While the second prong inquiry "is most often perfunctory and self-evident, the guiding standard is whether a restraining order is necessary, upon an evaluation of the [applicable] factors . . . to protect the victim from an immediate danger or to prevent further abuse." Ibid. (citing N.J.S.A. 2C:25-29(b)).

Stalking, N.J.S.A. 2C:12-10, is a predicate act of domestic violence enumerated under the PDVA. N.J.S.A. 2C:25-19(a)(14). "A person is guilty of stalking . . . if he [or she] purposefully or knowingly engages in a course of conduct directed at a specific person that would cause a reasonable person to fear for his [or her] safety . . . or suffer other emotional distress." N.J.S.A. 2C:12-10(b). "Course of conduct" means:

> repeatedly maintaining a visual or physical proximity
> to a person; directly, indirectly . . . by any action,

17

method, device, or means, following, monitoring, observing, surveilling, threatening, or communicating to or about, a person, or interfering with a person's property; repeatedly committing harassment against a person; or repeatedly conveying, or causing to be conveyed, verbal or written threats or threats conveyed by any other means of communication or threats implied by conduct or a combination thereof directed at or toward a person.

[N.J.S.A. 2C:12-10(a)(1).]

"Repeatedly" means "on two or more occasions." N.J.S.A. 2C:12-10(a)(2).

Harassment, N.J.S.A. 2C:33-4, is also a predicate act of domestic violence enumerated under the PDVA. N.J.S.A. 2C:25-19(a)(13). Under N.J.S.A. 2C:33-4(c), a person commits an act of harassment "if, with purpose to harass another, he [or she] . . . [e]ngages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person."

To commit harassment, a defendant must "act with the purpose of harassing the victim." D.M.R. v. M.K.G., 467 N.J. Super. 308, 323 (App. Div. 2021). "'A finding of a purpose to harass may be inferred from the evidence presented' and from common sense and experience." Ibid. (quoting H.E.S. v. J.C.S., 175 N.J. 309, 327 (2003)). "Although a purpose to harass can be inferred from a history between the parties, . . . that finding must be supported by some

18

evidence that the actor's conscious object was to alarm or annoy; mere awareness that someone might be alarmed or annoyed is insufficient." J.D., 207 N.J. at 487 (citation omitted). A judge must consider "the totality of the circumstances to determine whether the harassment statute has been violated." H.E.S., 175 N.J. at 326 (quoting Cesare, 154 N.J. at 404).

Pursuant to these principles, we affirm substantially for the reasons set forth in the court's oral opinion. We add these brief comments. There is no basis to disturb the court's factual findings or legal conclusions. The court had the opportunity to hear and consider the testimony of the witnesses and assess their credibility. Its factual findings are supported by substantial, credible evidence, and those facts were correctly applied to the law.

Defendant's contention that plaintiff did not prove the predicate acts of stalking and harassment lacks merit. The court found, based on plaintiff's credible testimony and defendant's admissions, defendant committed the predicate act of stalking by surveilling her with his drone on at least two occasions and interfered with her property by locking her out of the laptop in the marital home. Those findings are plainly sufficient to establish the predicate act of stalking.

A-0369-24

The court found harassment based on the same conduct. It found defendant did so with the purpose to harass plaintiff based on the nature of the conduct and the lack of any credible explanation for defendant's conduct other than that he intended to "alarm or seriously annoy" plaintiff. There is no reason for us to disturb the court's determination that defendant committed the predicate act of harassment.

To the extent we have not addressed any remaining arguments, it is because they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

A-0369-24